Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/05/2019 08:11 AM CST

- 822 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

In re Interest of Audrey T., a child
under 18 years of age.
State v. Nebraska, appellee,
v. Sabra T., appellant.

___ N.W.2d ___

Filed January 29, 2019.    No. A-17-1308.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **Parental Rights: Proof.** The bases for termination of parental rights are codified in Neb. Rev. Stat. § 43-292 (Reissue 2016). Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child.
3. **Parental Rights: Evidence: Appeal and Error.** If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in Neb. Rev. Stat. § 43-292 (Reissue 2016), the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground.
4. **Indian Child Welfare Act: Parental Rights: Proof: Expert Witnesses.** To terminate parental rights, the State must prove by clear and convincing evidence that one or more of the statutory grounds listed in Neb. Rev. Stat. § 43-292 (Reissue 2016) have been satisfied and that termination is in the child's best interests. The Nebraska Indian Child Welfare Act adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. Second, the State must prove by evidence beyond a reasonable doubt, including testimony of qualified

expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

5. ____: ____: ____: ____. Pursuant to the Nebraska Indian Child Welfare Act, before a court may terminate a parent's rights to their child or children, the State must prove by evidence, beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. This evidence must be established by qualified expert testimony provided by a professional person having substantial education and experience in the area of his or her specialty.

6. ____: ____: ____: ____. Neb. Rev. Stat. § 43-1505(6) (Reissue 2016) requires that the qualified expert's opinion must support the ultimate finding of the court, i.e., that continued custody by the parent will likely result in serious emotional or physical damage to the child.

7. **Parental Rights: Proof.** Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests.

8. **Parental Rights.** When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights.

9. ____. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity.

10. **Indian Child Welfare Act: Parental Rights: Proof: Notice.** The stated purposes of the Nebraska Indian Child Welfare Act are best served by allowing parents to raise, in their direct appeal from a termination of parental rights, the issue of the State's failure to notify the child's Indian tribe of the termination of parental rights proceedings.

Appeal from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Bernard J. Straetker, Scotts Bluff County Public Defender, for appellant.

Danielle Larson, Deputy Scotts Bluff County Attorney, for appellee.

PIRTLE, RIEDMANN, and WELCH, Judges.

- 824 -

Nᴇʙʀᴀsᴋᴀ Cᴏᴜʀᴛ ᴏғ Aᴘᴘᴇᴀʟs Aᴅᴠᴀɴᴄᴇ Sʜᴇᴇᴛs
26 Nᴇʙʀᴀsᴋᴀ Aᴘᴘᴇʟʟᴀᴛᴇ Rᴇᴘᴏʀᴛs
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

Wᴇʟᴄʜ, Judge.

## INTRODUCTION

Sabra T., the biological mother of Audrey T., appeals the termination of her parental rights. She contends that the Scotts Bluff County Court, sitting in its capacity as a juvenile court, erred in terminating her parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (5), (6), and (7) (Reissue 2016) and finding that termination was in Audrey's best interests. Sabra further contends that the State failed to prove beyond a reasonable doubt, as required by the Nebraska Indian Child Welfare Act (NICWA), Neb. Rev. Stat. §§ 43-1501 to 43-1517 (Reissue 2016), through qualified expert witness testimony, that the continued custody of Audrey by Sabra was likely to result in serious emotional or physical damage to Audrey. Finally, Sabra contends that the State failed to provide proper notice to the Oglala Sioux Tribe in violation of NICWA. For the reasons set forth herein, we affirm the order terminating Sabra's parental rights.

## STATEMENT OF FACTS

Sabra is the biological mother of Audrey, who was born in August 2013. Because Audrey is an enrolled member of the Oglala Sioux Tribe, NICWA applies to this case.

On January 5, 2016, the State filed an adjudication petition alleging that Audrey was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015) for the reason that she lacked proper parental care by reason of the fault or habits of Sabra. Specifically, the State alleged Sabra was unable to meet Audrey's basic needs for care and protection, Sabra uses inappropriate discipline, and Sabra's mental health issues put Audrey at risk of abuse and/or neglect. The petition further alleged that NICWA was applicable because Audrey was of Native American heritage. That same day, the court entered an order placing temporary custody of Audrey with Nebraska's Department of Health and Human Services (DHHS), and Audrey was removed from Sabra's home. Audrey has consistently been a ward of the State since that time.

- 825 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

On March 11, 2016, the court entered an order adjudicating Audrey as a child within the meaning of § 43-247(3)(a). The court found the State had met its burden, by a preponderance of the evidence, that Sabra was unable to meet Audrey's basic needs for care and protection and that her mental health issues put Audrey at risk of harm. The court further found that active efforts had been made by the State to "prevent the breakup of the Native American family," including family support, food vouchers, transportation, parenting classes, and case management; that the child would experience serious emotional or physical damage if left in the family home; that court placement was with a family member and was "ICWA compliant"; and that the court's "findings related to ICWA are supported by the testimony of an ICWA expert."

The State filed a motion to terminate Sabra's parental rights on July 31, 2017, alleging that termination was appropriate pursuant to § 43-292(2), (5), (6), and (7) and that termination was in Audrey's best interests. The termination motion also again set forth that NICWA was applicable to this case. The termination hearing was held on September 27 and concluded on October 27. The State adduced testimony from psychologist Dr. Gage Stermensky, mental health therapist Sarah Bernhardt, a youth transition support worker, Audrey's aunt, DHHS child and family service specialist Cassie Beasant, and Theresa Stands. Sabra testified in her own behalf.

The youth transition support worker testified that Sabra, who was born in 1994, has been in the youth transition support program since March 2016. The youth transition support program assists youth from 16 to 25 years old that have been diagnosed with mental illness and/or substance abuse to transition into adulthood by providing assistance in various areas such as housing, transportation, budgeting, finances, employment, vocational rehabilitation, and education. While in the program, Sabra has been receiving services specific to budgeting, forming healthy relationships, parenting techniques, and vocational rehabilitation. According to

- 826 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
26 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

the support worker, Sabra, who suffers from mental illness, struggles primarily in the areas of scheduling and engaging in healthy relationships.

In April 2016, Audrey and Sabra were referred to Bernhardt for child-parent psychotherapy. Bernhardt explained that child-parent psychotherapy is for children up to age 5 and "is an attachment-focused intervention, a therapy that is intended to treat a relationship between a caregiver and a child, particularly when there's been a trauma that has been experienced that has impacted their relationship." Bernhardt testified that Sabra's attendance at therapy was inconsistent: Bernhardt had a total of 25 visits with Sabra, 19 of which included Audrey, with 16 missed visits. Bernhardt testified that Audrey "knows her mother," they have a positive relationship, and there is a connection between them.

Beasant testified that she became the caseworker for this case at the end of November 2016 and that she remained the caseworker at the time of the termination hearing. When Beasant was assigned the case, Sabra was living in an apartment and was working at a bakery. Beasant testified that for a period of time, Sabra was having some unsupervised visits with Audrey in her apartment, but that ended in December 2016 after family support workers found unsafe individuals present with Audrey and Sabra during a drop-in visit. These "unsafe individuals" were people known to Beasant as methamphetamine users, individuals who were in treatment for alcoholism, or individuals who had their parental rights terminated to their own children. Sabra regained unsupervised visits between March and April 2017, but these unsupervised visits ended in August 2017 after Audrey alleged that an individual who lived at her foster home had sexually abused her. Audrey later recanted this accusation and said that Sabra had told her to make the accusation. Sabra had not regained unsupervised visits since that time. Further, to Beasant's knowledge, Sabra's visits with Audrey never included overnight visits.

- 827 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

Beasant testified that none of Sabra's goals have changed in any of the case plans prepared by DHHS. She clarified this testimony by stating that in the original case plan, the priority goals for Sabra were for safe and stable housing, a legal means of income, and safe parenting. According to Beasant, although Sabra has had the same original goals throughout the entire case, there have been periods of time where Sabra does very well with her goals, but "it doesn't last long and we're backsliding again." Some examples of this "backsliding" were that there were periods of time, from a couple of weeks to a month at a time, where Sabra would not miss work; would attend all of her visits; would make nutritious, homemade meals for Audrey; and would do activities with Audrey; however, Sabra would not sustain that progress, and during unsupervised visits, she would have unsafe individuals around Audrey.

Beasant explained that the permanency plan was changed to a goal of guardianship in April 2017. This change in the permanency goal was made, in part, at Sabra's request, so she would have more time to become "a more suitable parent" and gain more skills, including recognizing "red flags" in relationships and having appropriate "informal supports." Sabra wanted "to slow down the pace so that she wasn't overwhelmed." Even after Sabra had asked for more time to work on her case plan goals, she failed to make progress on them. Beasant explained, "It seemed to be at a standstill, plateaued, if you will, as to our progress that was being made. There was no consistency in therapy with Audrey, building those relationships, working on her parenting skills."

In part due to Sabra's lack of progress, in July 2017, the permanency plan goal was changed to adoption. The reasons for DHHS' recommendation that the goal be changed to adoption included Sabra's lack of progress during the 22 months the case had been open, the length of time the case had been open, and Sabra's failure to show any sustainable progress. Beasant further testified that DHHS' view is that it is in Audrey's best interests for Sabra's parental rights to be

- 828 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

terminated, because "Audrey is doing very well where she's at and excelling . . . ."

Stermensky testified that at DHHS' request, he completed a parental capacity evaluation of Sabra in 2016, which evaluation was received into evidence as an exhibit. According to Stermensky:

> The main goal for any child welfare capacity evaluation is to determine the ability for a parent to meet their child's welfare needs. And if they have displayed they can't meet those needs, why, [and are] there any types of processes or treatment we can find to help get them to a point where they're able to fulfill those needs.

His diagnostic impressions for Sabra included schizophrenia and post-traumatic stress disorder. Further, he testified that within a reasonable degree of "psychologic certainty," Sabra did not appear to have the capacity to meet Audrey's health and welfare needs; however, he opined that if Sabra was able to get longer-term treatment with medication compliance, the issue could be revisited. Stermensky based his opinion on Sabra's denial and minimization of her severe psychotic disorder and noncompliance with medications which placed her "at risk for decompensation," as well as placing Audrey at risk. Stermensky explained that decompensation, as it pertained to Sabra, meant "[s]ymptom amplification," including disorganized behavior, hallucinations, and delusions. Stermensky's recommendation for Sabra was for long-term treatment and medication management.

The State's evidence from Stands was admitted via deposition testimony received into evidence as an exhibit. Stands has been an enrolled member of the Oglala Sioux Tribe since she was born and has raised her children in the tribal traditions. Additionally, for 36 years, Stands worked for the Scottsbluff Public Schools in the "Title 7, Indian education" program. Stands testified she worked for the parent committee and her job was "to be advocate for Native American students and their families between the home and the school" and she "was also

- 829 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

an advocate for the schools to try to help them culturally with the Native American families." Stands also worked with native dance groups, set up a Lakota language class, and assisted with powwows. Stands testified that based upon her training, work experience, and her tribal membership, she is familiar with the values the Oglala Sioux Tribe places on its children. According to Stands, the tribe places a very high value on its children, stating that the children are provided "respect, generosity, our children are always considered sacred. So we take care of them and try to raise them by not just verbally but by living our lives so that they can do the right things."

Stands familiarized herself with Audrey's case by reviewing the case file, which included the DHHS case plan and court reports, as well as the court's journal entries and orders and documentation sent to the Oglala Sioux Tribe, guardian ad litem reports, and evaluations. Stands testified that based on her knowledge as an "expert witness in an ICWA case," the State had made the following active efforts in this case: providing support for Audrey and Sabra, including physical support, housing, food, therapy, counseling, and transportation. Further, based upon Stand's review of the file in this case, it was her understanding that Audrey had ended up in the State's care and custody because Sabra "was not mentally and emotionally able to care for her and Audrey may have been put in a place where she could have been neglected." Specifically, she identified Sabra's lack of knowledge of how to cook for Audrey, how to take care of her, or how to discipline her, as evidenced by one report that Sabra had disciplined Audrey by "duct tap[ing] her in a car seat." Stands opined that Sabra would make improvements in the case, but that she was not emotionally or mentally stable enough to maintain those improvements. She further testified that if the State "were to just walk away" from the case, it "was a possibility" that Audrey "would face emotional or physical damage" if left with Sabra due to Sabra's mental state, which had been described as "being depressed [and] overwhelmed,

- 830 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

having anxiety, [and] not being able to really provide for [Sabra's] own needs."

Sabra testified that she had been living in a two-bedroom apartment since the end of July 2017 and that she had been working part time at a fast-food restaurant for a little over 2 months. Sabra also receives Social Security benefits for mental health illness and has someone to help her manage her money. She testified that she is not a "bad parent," but, rather, she is just a "first-time parent," and that Audrey benefits from having a continued relationship with her.

In an order filed on December 8, 2017, the court terminated Sabra's parental rights pursuant to § 43-292(2), (5), (6), and (7) and found that termination was in Audrey's best interests. The court further found, by clear and convincing evidence, that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts were unsuccessful as to Sabra. The court further found, beyond a reasonable doubt, based upon the evidence at trial, including Stands' opinion testimony, that Audrey's continued custody or placement with Sabra was likely to result in serious emotional or physical damage. The court specifically found that Sabra's "mental health, parenting style, dangerous associations, and inconsistency would place Audrey in great danger if Sabra was the custodial parent and the case closed."

## ASSIGNMENTS OF ERROR

Sabra assigns as error that the court erred in terminating her parental rights pursuant to § 43-292(2), (5), (6), and (7). Sabra further contends that the State failed to prove beyond a reasonable doubt, as required by NICWA, through qualified expert witness testimony, that the continued custody of Audrey by Sabra was likely to result in serious emotional or physical damage to Audrey. She also contends that the court erred in finding that termination was in Audrey's best interests. Finally, Sabra contends that the State failed to provide proper notice to the Oglala Sioux Tribe in violation of NICWA.

- 831 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
26 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

## STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016).

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

Sabra first contends that the court erred in terminating her parental rights based upon its findings that the State had established by clear and convincing evidence that she had substantially and continuously neglected to give Audrey necessary parental care and protection (§ 43-292(2)), that Sabra was unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period (§ 43-292(5)), that reasonable efforts failed to correct the condition which led to the adjudication (§ 43-292(6)), and that Audrey had been in an out-of-home placement for 15 or more of the most recent 22 months (§ 43-292(7)).

[2] The bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). Under § 43-292(7), grounds exist to terminate parental rights if a "juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months."

The record establishes that Audrey was removed from parental care on January 5, 2016, and has not been returned to parental care since that time. As such, at the time the State filed its motion to terminate Sabra's parental rights on July 31, 2017, Audrey had been in an out-of-home placement for 18 months. By the time the termination hearing began in

- 832 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

September, Audrey had been in an out-of-home placement for 20 months. Thus, our de novo review of the record clearly and convincingly shows that Audrey had been in an out-of-home placement for 15 of the most recent 22 months and that grounds for termination of Sabra's parental rights under § 43-292(7) were proved by sufficient evidence.

[3] If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Chloe C.*, 20 Neb. App. 787, 835 N.W.2d 758 (2013). Having determined that termination of Sabra's parental rights was proper pursuant to § 43-292(7), we need not consider whether termination was also appropriate under § 43-292(2), (5), or (6).

## Qualified Expert Testimony

[4] To terminate parental rights, the State must prove by clear and convincing evidence that one or more of the statutory grounds listed in § 43-292 have been satisfied and that termination is in the child's best interests. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). NICWA adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. *Id.* First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. See § 43-1505(4). See, also, *In re Interest of Walter W., supra*. Second, the State must prove by evidence beyond a reasonable doubt, "including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." See § 43-1505(6).

We note that although Sabra has not assigned any error with respect to the court's findings that the State proved by clear and convincing evidence that active efforts had been made

- 833 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

to prevent the breakup of the Indian family and that those efforts were unsuccessful, we have reviewed the record and find no plain error as it relates to that element. Thus, we turn to Sabra's specific alleged error that the State failed to prove beyond a reasonable doubt, as required by NICWA, through qualified expert witness testimony, that the continued custody of Audrey by Sabra was likely to result in "serious emotional or physical damage" to Audrey.

[5] Pursuant to NICWA, before a court may terminate a parent's rights to their child or children, the State must prove by evidence, beyond a reasonable doubt, "including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." § 43-1505(6). This evidence must be established by qualified expert testimony provided by a professional person having substantial education and experience in the area of his or her specialty. *In re Interest of Shayla H. et al.*, 17 Neb. App. 436, 764 N.W.2d 119 (2009).

In this case, Sabra does not argue that Stands was not a qualified expert; she argues only that Stands' opinion—that there "was a possibility" that Audrey would face emotional or physical damage if left with Sabra—did not meet the State's burden of proving this issue beyond a reasonable doubt. Sabra's argument calls into question what testimony is required from a qualified expert as mandated by § 43-1505(6). We construe Sabra's argument to be that the qualified expert's testimony must establish that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child beyond a reasonable doubt.

A similar argument was propounded in *In re M.F.*, 290 Kan. 142, 225 P.3d 1177 (2010). In reviewing a federal statute which contains language identical to § 43-1505(6), the Kansas Supreme Court wrote:

> The GAL also takes issue with the Court of Appeals' statement that the qualified expert must "testify that

- 834 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

evidence existed to support the State's burden under the ICWA." *In re M.F.*, 41 Kan.App.2d at 935, 206 P.3d 57. The GAL interprets this statement to mean that a qualified expert must offer a specific opinion as to whether or not the State's evidence meets the burden of proof. It seems, rather, that the Court of Appeals' statement is merely a reiteration of the ICWA standard that a decision to terminate parental rights must be based on "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). The expert need not opine on the ultimate issue of whether the State met its burden of proof. But the expert's opinion must support the ultimate finding of the district court that continued custody by the parent will result in serious emotional or physical damage to the child. See, *e.g.*, *Marcia V.*, 201 P.3d at 506; *Steven H. v. DES*, 218 Ariz. 566, 572, 190 P.3d 180 (2008); *State ex rel. SOSCF v. Lucas*, 177 Or.App. 318, 326, 33 P.3d 1001 (2001), *rev. denied* 333 Or. 567, 42 P.3d 1245 (2002).

*In re M.F.*, 290 Kan. at 155-56, 225 P.3d at 1186. See 25 U.S.C. § 1912(f) (2012).

[6] We, likewise, construe § 43-1505(6) to require that the qualified expert's opinion must support the ultimate finding of the court, i.e., that continued custody by the parent will likely result in serious emotional or physical damage to the child. This is consistent with the Nebraska Supreme Court's holding in *In re Interest of C.W. et al.*, 239 Neb. 817, 823-24, 479 N.W.2d 105, 111 (1992), *overruled on other grounds*, *In re Interest of Zylena R. & Adrionna R.*, 284 Neb. 834, 825 N.W.2d 173 (2012), wherein the Nebraska Supreme Court set forth the standard for qualified expert testimony in ICWA cases:

Pursuant to the ICWA, qualified expert testimony is required in a parental rights termination case on the issue

- 835 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

of whether serious harm to the Indian child is likely to occur if the child is not removed from the home. See Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,593 (1979) (not codified).

To the extent Sabra is arguing there was inadequate opinion testimony from a qualified expert to support the ultimate finding of the county court that continued custody by Sabra is likely to result in serious emotional or physical damage to the child, we disagree.

Sabra argues that Stands' opinion—that there "was a possibility" that Audrey would face emotional or physical damage if left with Sabra—did not provide adequate support for the county court's finding here, which was, that beyond a reasonable doubt, Sabra's "mental health, parenting style, dangerous associations, and inconsistency would place Audrey in great danger if Sabra was the custodial parent and the case closed." In addition to opining that physical and emotional damage to Audrey was possible, Stands also testified that although Sabra at times made some improvements, Sabra was not emotionally or mentally stable enough to maintain those improvements and expressed concern for Sabra's reported conditions, which included being depressed, overwhelmed, having anxiety, and not being able to provide for Sabra's own needs, much less those of Audrey.

But this was not the only testimony from a qualified expert in this case. As the Nebraska Supreme Court noted:

The Bureau of Indian Affairs sets forth guidelines under which expert witnesses most likely will meet the requirements of the ICWA:

"(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

"(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians,

- 836 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

and extensive knowledge of prevailing social and cultural standards in childrearing practices within the Indian child's tribe.

"(iii) A professional person having substantial education and experience in the area of his or her specialty."

*In re Interest of C.W. et al.*, 239 Neb. at 824, 479 N.W.2d at 111.

We also note that in its more recent guidelines, the Bureau of Indian Affairs provides, in part:

The rule does not, however, strictly limit who may serve as a qualified expert witness to only those individuals who have particular Tribal social and cultural knowledge. The rule recognizes that there may be certain circumstances where a qualified expert witness need not have specific knowledge of the prevailing social and cultural standards of the Indian child's Tribe in order to meet the statutory standard.

U.S. Dept. of Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act G.2 at 54 (Dec. 30, 2016) (providing minimum federal standards regarding compliance with 25 C.F.R. § 23.122 (2018) governing who may serve as qualified expert witness).

Stermensky, a psychologist, performed a parental capacity examination of Sabra. Stermensky testified that the main goal of this evaluation is to determine whether the parent can meet a child's welfare needs. In performing the examination, Stermensky opined that Sabra suffered from schizophrenia and post-traumatic stress disorder and that to a reasonable degree of "psychologic certainty," Sabra did not appear to have the capacity to meet Aubrey's health and welfare needs. Although he opined that with long-term treatment and medication compliance the issue could be revisited, the overwhelming evidence in this case demonstrates that little or no progress has been made by Sabra to manage her condition as it relates to the future care of Audrey. Stemernsky further testified that Sabra's denial and minimization of her severe psychotic

- 837 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
26 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

disorder and noncompliance with medication placed her "at risk of decompensation," meaning "[s]ymptom amplification," including disorganized behavior, hallucinations, and delusions, which placed Audrey at risk. This record adequately demonstrates that both Strands and Stermensky were qualified expert witnesses as required by ICWA, and taken together, their testimony adequately supports the ultimate finding by the county court.

Moreover, other evidence presented at the termination hearing supports the ultimate finding here—that Audrey was likely to suffer serious emotional or physical damage if left with Sabra. Sabra has been inconsistent in attending child-parent therapy, her visitation has never progressed to overnight visits, and she has failed to make progress on her case plan goals even after requesting additional time to do so. Whenever Sabra's visits with Audrey were changed to unsupervised visits, they did not remain that way for long due to Sabra's allowing unsafe individuals around Audrey or coaching Audrey to make untrue allegations of sexual abuse. Taken together, this evidence and the expert testimony established, beyond a reasonable doubt, that Sabra's continued custody of Audrey was likely to result in serious emotional or physical damage to Audrey. Sabra's claim is without merit.

## BEST INTERESTS

[7] Sabra also contends that the court erred in finding that termination was in Audrey's best interests. Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests. *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016).

> A parent's right to raise his or her child is constitutionally protected. Therefore, before a court may terminate parental rights, the State must show that the parent is unfit. . . . There is a rebuttable presumption that the best interests of the child are served by having a relationship with his

- 838 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. . . . In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. . . . The best interests analysis and the parental fitness analysis are fact-intensive inquiries, and while they are separate, each examines essentially the same underlying facts.

*In re Interest of Lizabella R.*, 25 Neb. App. 421, 436-37, 907 N.W.2d 745, 756 (2018).

[8,9] Sabra contends that the State did not prove by clear and convincing evidence that termination was in Audrey's best interests. She argues that she has obtained an apartment and employment, has made improvements in her parenting skills, and has a bond with Audrey. This court has no doubt of Sabra's love for her daughter. Despite this, Sabra has been inconsistent in attending child-parent therapy, her visitation has never progressed to overnight visits, the case has been open over 22 months, and Sabra has failed to make progress even after requesting additional time to do so. The evidence further established that Audrey was "excelling" in her current placement. Sabra has been diagnosed with schizophrenia and post-traumatic stress disorder, and in Stermensky's opinion, she does not have the capacity to meet Audrey's health and welfare needs. Due to her denial of her severe psychotic disorder, Stermensky opined, she is at risk of "[s]ymptom amplification," including hallucinations and delusions, which could place Audrey at risk of harm. The evidence outlined in the previous section further establishes that Sabra is an unfit parent and that termination of Sabra's parental rights is in Audrey's best interests. When a parent is unable or unwilling

- 839 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). Further, children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

### Failure to Give Proper Notice to Tribe

[10] Sabra contends that the State failed to provide proper notice to the Oglala Sioux Tribe in violation of NICWA. We note that the State argues as follows in its brief:

> Allowing represented parties to wait until after the conclusion of the case on the merits to raise issue with the beginning of the case is against public policy, ideas about judicial efficiency, and case law. The State would respectfully request this Court hold by failing to timely and appropriately plea or motion their objection to the mailing of notice [to the tribe], [Sabra] has waived any defect in the notice.

Brief for appellee at 20. We reject this argument based upon our holding in *In re Interest of Walter W.*, 14 Neb. App. 891, 899, 719 N.W.2d 304, 310 (2006), which stated:

> Because in many, if not most, instances, tribes depend upon parents to notify the State of known or potential Indian ancestry, and because Indian tribes cannot intervene in cases of which they have received no notification, logic dictates that parents may often be best situated to raise claims of inadequate notice to tribes. Therefore, we believe the stated purposes of the ICWA are best served by allowing parents to raise, in their direct appeal from a termination of parental rights, the issue of the State's failure to notify the child's Indian tribe of the termination of parental rights proceedings as required by § 43-1505(1).

- 840 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

Thus, we determine that Sabra's assigned error is properly before this court.

Sabra acknowledges that notices were provided to the Oglala Sioux Tribe, but she claims that the addresses used by the State were incorrect. Her brief states that "[t]he Oglala Sioux Tribe's website currently lists the Tribe's ICWA Director as Shirley Blackstone-Weston, P.O. Box 604, Pine Ridge, SD 57770" and argues that the notices sent by the State to the Tribe at other "P.O. Box[es] . . . would not have gone to the designated ICWA directors." Brief for appellant at 28. We agree with the State's argument that any current address identified on the Oglala Sioux Tribe's website is "irrelevant" to the address in effect in August 2017 when notice was sent to the tribe. Brief for appellee at 18.

Section 43-1505(1) requires that to be proper, notice be sent (1) to the "Indian child's tribe," (2) by certified or registered mail with return receipt requested, (3) with notice of the pending proceedings, (4) with notice of the tribe's right of intervention, and (5) that no termination of parental rights proceeding shall be held until at least 10 days after receipt of notice by the tribe and that the tribe may have an additional 20 days to prepare for the proceeding if requested. See *In re Interest of Dakota L. et al.*, 14 Neb. App. 559, 712 N.W.2d 583 (2006).

In the case before this court, the termination of parental rights notice provided to the Oglala Sioux Tribe is not part of our record; however, there is an "Affidavit of Mailing Notice" from a legal secretary in the Scotts Bluff County Attorney's office regarding the mailing of the ICWA notice to the tribe. The affidavit of mailing notice provides that the termination notice to the Oglala Sioux Tribe was mailed, by certified mail, return receipt requested, to the "Oglala Sioux Tribe, P. O. Box 2070, Pine Ridge, SD, 57770" on August 28, 2017. We note that "P. O. Box 2070" is the same address listed on the "Certificate of Indian Blood" submitted by the State and which certified that Audrey was an enrolled member of the Oglala

- 841 -

Nebraska Court of Appeals Advance Sheets
26 Nebraska Appellate Reports
IN RE INTEREST OF AUDREY T.
Cite as 26 Neb. App. 822

Sioux Tribe. This certificate was received into evidence in a prior hearing in this case as an exhibit. Further, the record reflects that two notices were mailed to the Oglala Sioux Tribe at the "P.O. Box 2070" address (in February 2016 and February 2017) and that the return receipt was signed and returned in both instances from that address. Thus, the notice regarding the hearing on the termination of parental rights was sent, by certified mail, return receipt requested, to the Oglala Sioux Tribe at the address listed on the "Certificate of Indian Blood" and to the same address where previous notices were sent and received by the tribe. In this case, the affidavit provided by the State establishes that the State provided notice to the tribe at the address where it had been providing notice throughout this case. We decline to reverse the order of termination on the grounds that Sabra now deems that the address used was insufficient.

## CONCLUSION

The county court, sitting in its capacity as a juvenile court, properly found that evidence supported termination of Sabra's parental rights pursuant to § 43-292(7) and that termination of parental rights was in Audrey's best interests. The State established through evidence, including testimony of qualified expert witnesses, beyond a reasonable doubt, that the continued custody of Audrey by Sabra was likely to result in serious emotional or physical damage to Audrey. We further reject Sabra's claim that the State failed to provide proper notice to the Oglala Sioux Tribe.

Affirmed.