IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF KEZIAH S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF KEZIAH S., A CHILD
UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JESSIE S., APPELLANT, AND WILLIAM S., APPELLEE.

Filed January 19, 2021.    No. A-20-381.

Appeal from the County Court for Scotts Bluff County: KRIS D. MICKEY, Judge. Affirmed.

Leonard G. Tabor for appellant.

No appearance for appellees.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Jessie S. appeals the order of the Scotts Bluff County Court, sitting as a juvenile court, terminating her parental rights to Keziah S. pursuant to Neb. Rev. Stat. § 43-292(2) and (4) (Reissue 2016) and finding that termination was in the minor child's best interests. The court also found, as required by the Nebraska Indian Child Welfare Act (NICWA), Neb. Rev. Stat. §§ 43-1501 to 43-1517 (Reissue 2016), that active efforts had been made to prevent the breakup of the Indian family, which proved unsuccessful, and that the continued custody of Keziah by Jessie was likely to result in serious emotional or physical damage to Keziah. Based upon our de novo review of the record, we affirm.

- 1 -

BACKGROUND

Jessie and William S. are the biological parents of Keziah, born July 2019. On July 31, 2019, the Nebraska Department of Health and Human Services (DHHS) received an intake report alleging physical neglect of Keziah. In August, Jessie and William agreed to participate in a non-court case and started voluntary services at that time.

On December 19, 2019, the State filed a petition alleging that Keziah was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Specifically, the petition alleged that the child was a juvenile who lacked proper parental care by reason of the fault or habits of her parents in that her parents' use of drugs placed her at risk of harm and/or deprived her of necessary parental care, and her parents had their rights to another child terminated and the parents had not completed any steps to remedy the situation leading to the termination, placing Keziah at risk of harm and/or depriving her of necessary parental care or protection. Jessie and William's parental rights to their child, Billy S., born September 2017, were terminated in January 2019.

The petition further alleged simultaneous termination of Jessie and William's parental rights pursuant to § 43-292(2), (4), and (9); that termination was in Keziah's best interests; and that the State had made active efforts to provide remedial services and rehabilitative programs, although unsuccessfully, to prevent the breakup of the Indian family. Because Keziah is of Native American Heritage, NICWA applies to this case.

Keziah was removed from Jessie's care the same day the petition was filed and placed in the care and custody of DHHS.

A hearing on the petition was held on March 16, 2020. The evidence showed that Jessie and William had been in a relationship for 6 years and have a history of domestic violence between them. Kristin Massie, a Gering Police Officer, testified that she had interaction with Jessie and William a "handful of times" based on reports of disturbances. The most recent call was on January 8, 2020. Jessie reported that William either pushed over the chair she was sitting in or pushed her into a chair. Jessie was pregnant at the time. Massie testified that Jessie was mostly concerned that William had taken her phone. William was arrested on January 8 and charged with domestic assault on a pregnant woman.

Matthew McKeon, a probation officer, testified that Jessie was on probation at the time of the hearing and he had been her supervising officer since October 2018. She had been arrested in April for several charges, including driving under the influence. McKeon stated that Jessie has "struggled" in complying with the terms of her probation. He testified random drug tests are a term of her probation, which results in getting called to test two to three times per week, and Jessie had only submitted to less than five drug tests. She was sanctioned in January 2020 for missing drug tests, failing to report to McKeon, and failing to attend group meetings. McKeon testified that since being sanctioned in January, she had not submitted to a single random drug test. He testified that she had completed a mental health evaluation in June 2019, but just started working on the recommendations from the evaluation 2 weeks before the hearing. The recommendations included intensive outpatient programming (IOP), which focuses on substance abuse issues, and trauma-based counseling. He testified he believed Jessie had recently signed up for IOP and was supposed to start soon.

Edward Gama testified that he was Keziah's caseworker during the noncourt case. He explained that a noncourt case is a way to implement services for parents without the court being involved. He was Keziah's caseworker until December 2019, when the State filed its petition. Gama testified that during his involvement the main concerns for Jessie were her history of methamphetamine use and her mental health. He testified that Jessie claimed she was seeing a therapist but had not signed a release so he was unable to verify that she was seeing a mental health provider. Gama stated that he asked for a release every time he visited her, which was eight or nine times. He testified that without a release, the services he could provide were limited.

The services he was able to offer included Healthy Families of America, which works in the home with the parents on such things as child development and attachment, activities to do with a child, and parenting skills. Jessie participated initially, but then ended the service after a physical and developmental health assessment of Keziah was performed and it was determined she was developmentally on track. Jessie indicated that all she needed to hear was that Keziah was doing well developmentally.

Gama also made a referral for intensive family preservation (IFP), which started December 9, 2019. He testified that Jessie did cooperate, but there was difficulty contacting her for initial intake and issues in scheduling sessions.

In regard to Jessie's methamphetamine use, Gama testified that Jessie relapsed twice during the time he was the caseworker. The first time was sometime between late October and mid-November 2019, and the second time was at the end of November. At the time of the second relapse, she admitted herself to the behavioral health unit at the hospital.

Gama also testified that Jessie described her relationship with William as "very toxic," and when she was asked what she meant by that, she said that she and William would get into arguments that would become very physical.

Kylie Wilson was assigned as the caseworker to Keziah's case in December 2019. She also worked with Jessie in the prior juvenile case that resulted in the termination of her parental rights to Billy. That case began because Jessie tested positive for illegal substances at the hospital when Billy was born. Jessie was provided multiple services in Billy's case, including case management services, family team meetings, supervised parenting time, transportation, a psychological evaluation, pretreatment assessments, and family support. Jessie also went to a residential treatment facility during Billy's case, but was discharged without finishing the program.

Wilson testified that Jessie's mental health, her substance use, and domestic abuse were ongoing concerns in Billy's case and continue to be concerns in the present case. She explained that there continues to be a need for Jessie to participate in services to help manage her mental health, such as outpatient services or medication management.

In regard to domestic abuse, William was arrested in January 2020 for a domestic violence charge against Jessie and went to jail. During the time William was incarcerated, there was a no-contact order in place between him and Jessie. Jessie told Wilson that she did not want any contact with William nor did she have any contact with William in jail. However, Wilson discovered that jail records showed a call between them on February 29. During this same time period, Jessie told Wilson that her relationship with William was not a good relationship to be in and that she was participating in services to help her get out of the relationship.

Wilson testified about the services that have been offered in the present case, which included supervised visitation, family support, family team meetings, and referrals for Healthy Families of America, Circle of Security, and women's trauma classes. Wilson testified that co-occurring IOP was still being recommended, as it first was in the June 2019 evaluation. Jessie had only attended 13 out of 35 supervised visitations with Keziah. Wilson testified that many visits were missed because Jessie would not answer the door when family support came to the house with Keziah.

Wilson testified that DHHS was recommending termination of Jessie's parental rights so Keziah can have stability and permanency in a home that is willing to meet her needs on a consistent basis. She stated that the only change Jessie has made since termination of her parental rights to Billy was that she had housing. Billy's case lasted almost a year and involved the same concerns as the present case and no progress was made. Jessie's substance abuse and her mental health, as well as the domestic violence with William, all continued to be concerns as they were during Billy's case. Wilson testified that Jessie acknowledged during Billy's case that she needed to get help for substance abuse, but she had failed to show follow through to maintain sobriety.

Wilson stated that because Jessie has not addressed any of the concerns that led to removal from the home, Keziah could not be safely returned to Jessie's home. Wilson further testified that until substantial steps were taken to address the ongoing concerns, she did not believe Jessie could effectively and safely parent Keziah. She also stated that based on the services offered in Billy's case and the present case, she was not aware of any other services DHHS could provide.

The State also offered the deposition testimony of Luke Yellow Robe, an expert witness as required by NICWA. He reviewed records and documents in the present case as well as Billy's juvenile case. Yellow Robe testified that DHHS had made active efforts to prevent the breakup of the family and that those efforts have been unsuccessful based on Jessie's unwillingness to participate in the services offered. He also testified that it would be "beyond injurious, it would be dangerous" for Keziah if she was returned to Jessie's care and custody.

Jessie testified in her own behalf. She admitted that she has addiction issues with alcohol and methamphetamine. She testified that she has struggled with methamphetamine use since age 11 and with alcohol use since age 14. She admitted that she has only submitted to five drug tests despite being required to be tested two to three times per week. She testified that she has missed drug tests for a variety of reasons: she had a hard time getting around after having her appendix removed; weather issues; and she sleeps most of the day. She testified that she had quit drinking and that she could not remember when she had her last drink because it was so long ago. She stated that the last time she used methamphetamine was around January 1, 2020. She also testified that she believes she has "grown up quite a bit" since Billy's case and is "starting to work on [her] problems."

When Jessie was asked about her current relationship status with William, she stated that they were each other's main support and "have the potential to be good together."

Jessie was asked why she had missed so many visits with Keziah and she said it was just too hard to accept that she had been taken away so she chose not to see her.

The juvenile court entered an order adjudicating Keziah as a child within the meaning of § 43-247(3)(a), and finding that the State proved by clear and convincing evidence that statutory grounds existed to terminate Jessie's parental rights under § 43-292(2) and (4), and that termination

was in Keziah's best interests. The court found insufficient evidence to terminate parental rights under § 43-292(9). The court also found, as required by NICWA, that active efforts had been made to prevent the breakup of the Indian family, which proved unsuccessful, and that the continued custody of Keziah by Jessie was likely to result in serious emotional or physical damage to Keziah.

The court also terminated William's parental rights, but this appeal only involves the termination of Jessie's parental rights. We have referred to William only as necessary to the resolution of Jessie's appeal.

## ASSIGNMENTS OF ERROR

Jessie assigns that the juvenile court erred in finding that statutory grounds existed to terminate her parental rights based on § 43-292(2), (4), and (9), and that it was in Keziah's best interests to terminate her parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id.*

## ANALYSIS

Under § 43-292, in order to terminate parental rights, the State must prove, by clear and convincing evidence, that one or more of the statutory grounds listed in this section have been satisfied and that termination is in the child's best interests. *In re J'Endlessly F. et al.*, 26 Neb. App. 497, 920 N.W.2d 858 (2018). Clear and convincing evidence is the amount of evidence that produces in the trier of fact a firm belief or conviction about the existence of the fact to be proven. See *In re Interest of Gavin S. & Jordan S.*, 23 Neb. App. 401, 873 N.W.2d 1 (2015).

*Statutory Grounds.*

Jessie asserts that the juvenile court erred in finding that Keziah came within the meaning of § 43-292(2), (4), and (9). The juvenile court found that the State established by clear and convincing evidence that grounds for termination existed under § 43-292(2) and (4). It found the evidence was insufficient to terminate under § 43-292(9).

Section 43-292(2) requires proof that the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. The questions of what constitutes neglect and necessary parental care and protection are generally determined on a case-by-case basis, but common factual patterns include parental incarceration, adjudication, involuntary termination, or relinquishment of previous children, unsanitary house and unkempt children, or addiction to drugs or alcohol. See *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017).

The evidence established that prior to this case, Jessie's child, Billy, had been removed from her care in September 2017, just after he was born, and her parental rights to Billy were terminated in January 2019. The main concerns in Billy's case were Jessie's substance abuse, her mental health, and the domestic abuse that occurred between her and William. At the time of the

termination hearing in the present case, the same concerns were still ongoing and Jessie had made little effort to address the concerns. In regard to substance abuse, Jessie was on probation at the time of the hearing for DUI and had not been complying with the terms of her probation. In January 2020, she was sanctioned for missing random drug tests, failing to report to her probation officer, and failing to attend group meetings. She had only submitted to a few drugs tests between October 2018 and March 16, 2020, the date of the hearing. She had started a program at a residential treatment facility during Billy's case, but was discharged without finishing the program. The record also reflects that Jessie relapsed and used methamphetamine sometime between late October and mid-November 2019, the end of November, and around January 1, 2020.

In regard to Jessie's mental health, she had an evaluation from June 2019 recommending co-occurring IOP. Wilson testified that Jessie had another mental health intake completed 3 weeks prior to the hearing and co-occurring IOP was still recommended. On the date of the hearing, Jessie was not enrolled in IOP. Wilson also stated that there continues to be a need for Jessie to participate in services to help manage her mental health, such as outpatient services or medication management.

Domestic abuse also continued to be a concern for those working with Jessie. Massie testified that she had responded to multiple reports of disturbances between Jessie and William, the most recent being January 8, 2020. William was arrested that day for domestic assault of a pregnant woman. Jessie described her relationship with William as "very toxic," meaning she and William would get into arguments that would become very physical. Jessie told Wilson that her relationship with William was not a good relationship and that she was participating in services to help her get out of the relationship. However, during the time William was incarcerated for assaulting Jessie, she had a telephone call with him on February 29, despite a no-contact order. That telephone call was just 16 days before the termination hearing. When Jessie was asked about her current relationship status with William, she stated that they were each other's main support and "have the potential to be good together."

Jessie's visitation record further supports termination of her parental rights under § 43-292(2). Jessie only attended 13 out of 35 supervised visitations with Keziah. Wilson testified that many of Jessie's visits were missed because Jessie would not answer the door when family support came to the house for visits. Jessie also testified that she missed visits because it was too hard to accept that Keziah had been taken away.

Wilson testified that until substantial steps were taken to address the ongoing concerns, she did not believe Jessie could effectively and safely parent Keziah. She also stated that based on the services offered in Billy's case and the present case, she was not aware of any other services DHHS could provide.

We conclude that the State proved by clear and convincing evidence that grounds to terminate Jessie's parental rights existed under § 43-292(2).

We need not consider whether termination of Jessie's parental rights was proper under § 43-292(4) since any one of the 11 grounds identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

Before turning our focus on whether or not termination of Jessie's parent rights was in Keziah's best interests, we must determine whether the State complied with the additional

conditions set forth by NICWA. NICWA adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. *In re Interest of Audrey T.*, 26 Neb. App. 822, 924 N.W.2d 72 (2019). First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. *Id.* See § 43-1505(4). Second, the State must prove by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *In re Interest of Audrey T., supra.* See § 43-1505(6).

Jessie does not assert that the State did not meet the requirements of NICWA. Upon our de novo review of the record, we find that the State presented sufficient evidence demonstrating that active efforts were made to prevent the breakup of Jessie and Keziah, and these efforts were unsuccessful. Likewise, the State offered the deposition of Yellow Robe, a qualified expert witness, who indicated that Keziah would likely suffer serious emotional or physical damage if she was placed with Jessie. Therefore, we find that the State satisfied the requirements of NICWA, in addition to proving that a statutory basis existed to terminate Jessie's parental rights.

*Unfitness and Best Interests.*

In addition to proving a statutory ground for termination, the State must show that termination is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.*

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Nicole M., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

Jessie has not shown a desire to change the concerns that led to Keziah's removal and they are the same concerns that led to the termination of her parental rights to Billy. Her substance abuse continues to be a concern despite efforts by the State since September 2017 to help her overcome her drug use. Even after having her rights terminated to Billy, she has failed to take advantage of the services offered to her to address her substance abuse and mental health. She also fails to realize that her relationship with William is not a healthy or safe relationship for her or Keziah. She has indicated at different times that she wants to end her relationship, but she has failed to break ties with him. She still believes they could be good together and relies on him as her support system. As Wilson testified, Keziah deserves a stable home that can meet her needs on a consistent basis. Jessie is not able to provide such an environment.

Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). We find that the State has rebutted the presumption of parental fitness as to Jessie. We further find that there is clear and convincing evidence that it is in the best interests of Keziah to terminate Jessie's parental rights.

CONCLUSION

We conclude the juvenile court did not err in finding a statutory basis to terminate Jessie's parental rights under § 43-292(2) or in finding that termination was in Keziah's best interests.

AFFIRMED.