IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF A.M. & S.K.S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF A.M. AND S.K.S., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLANT,

V.

KILYNN K., APPELLEE.

Filed October 29, 2019.    No. A-19-247.

Appeal from the County Court for Washington County: C. MATTHEW SAMUELSON, Judge. Affirmed.

M. Scott Vander Schaaf, Washington County Attorney, Desirae M. Solomon, and Katherine R. Chadek for appellee.

Kristine Roberts, of Roberts Law Office, L.L.C., for appellee.

Kelly M. Henry-Turner, of Drew Law Firm, P.C., L.L.O., guardian ad litem.

MOORE, Chief Judge, and PIRTLE and WELCH, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

The State of Nebraska appeals from the order of the county court for Washington County sitting as a juvenile court, which found that although the State had proven grounds for termination of the parental rights of Kilynn K. to her children under Neb. Rev. Stat. § 43-292(7) (Reissue 2016), it had not proven grounds for termination under § 43-292(6) or that termination of Kilynn's parental rights was in her children's best interests. Following our de novo review of the record, we affirm.

- 1 -

## II. BACKGROUND

### 1. PETITION AND REMOVAL

Kilynn is the mother of A.M., born in 2008, and S.K.S., born in 2013. Kilynn was married to Kirk K. at the time of the children's births, but Kilynn and Kirk subsequently divorced. The juvenile court terminated Kirk's parental rights on August 30, 2018, after his voluntary relinquishment of his parental rights as the children's legal father. Although there is some information in the record suggesting that another individual is A.M.'s biological father, the record does not show that this was ever established through paternity testing, and there are not any proceedings in the record on appeal with respect to this individual. Kilynn's live-in boyfriend, Nicholas S., has been a father figure to both children, and he considers them his daughters. Although there were allegations against Nicholas (with respect to S.K.S. only) in the juvenile petitions filed by the State, the case against Nicholas was dismissed once he was excluded as S.K.S.' biological father, and we discuss him only as necessary to our resolution of Kilynn's appeal. The children were removed from Kilynn's care (the residence where she resided with Nicholas) on March 4, 2016, due to allegations about the condition of the home and A.M.'s hygiene, and they have remained in out-of-home placement with Nicholas' parents since that time.

On March 4, 2016, the State filed a juvenile petition, alleging that A.M. and S.K.S. were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) and at risk for harm because Kilynn and Nicholas (who was alleged at that time to be the father of S.K.S.) had failed to provide proper parental care. The juvenile court granted the motion for temporary custody filed by the State that same day and placed the children in the temporary care and custody of the Nebraska Department of Health and Human Services (Department). On March 7, the State filed an amended petition, more specifically alleging that the children were at risk for harm because on March 4 the residence was found by law enforcement to be in a filthy and unwholesome condition; Kilynn and Nicholas had failed to provide safe, stable, and appropriate housing; and Kilynn and Nicholas had failed to provide proper parental care, support, and/or supervision. A subsequent amendment by interlineation removed the allegation that Kilynn had failed to provide the children with proper parental care, support, and/or supervision.

### 2. ADJUDICATION AND REVIEW

An adjudication hearing was held on May 18, 2016. Kilynn entered a no contest plea to the allegations of the amended petition, and the juvenile court adjudicated the children as within the meaning of § 43-247(3)(a). The court ordered the Department to pay for paternity testing for Nicholas, who agreed to cooperate with the testing; the court dismissed Nicholas from the case on July 7.

At a dispositional hearing on July 11, 2016, the juvenile court continued the children in out-of-home placement, found that Kilynn was making good progress, and ordered her to comply with the recommendations of the Department's case plan. The primary permanency goal at that time was reunification. The case plan set forth two goals for Kilynn (we note that although Nicholas was dismissed from the case, he was included in all of the Department's case plans, which were received into evidence at the termination trial). First, Kilynn was to maintain a safe and

suitable home as evidenced by utilizing positive social supports and positive coping skills and maintain mental health treatment. To accomplish this goal, Kilynn was to work with family support to identify stressors and positive coping skills, work on implementing and using those positive coping skills, identify positive social supports and foster relationships with them, complete both a psychiatric and a psychological evaluation and follow any recommendations, and continue attending individual therapy. At that time, Kilynn had completed a psychological evaluation and was working on the recommendations and had been attending individual therapy. The second goal required Kilynn to provide a safe, suitable home as evidenced by having age appropriate child and parent interactions, utilizing age appropriate discipline, and ensuring a home free of hazards. Strategies to accomplish this goal included attending parenting classes, utilizing skills learned in those classes, working with family support to create a household budget and to clean and organize the home, and eradicating insects from the home. The case plan noted that Kilynn and Nicholas had been proactive in "keeping the bug infestation down" and that they had been washing dishes after meals. Case plans with similar goals and strategies were adopted by the court at subsequent review hearings.

At the first review hearing held on January 19, 2017, the juvenile court found that fair to better than fair progress had been achieved. Reunification continued to be the primary permanency plan. The progress notes included in the case plan adopted at that hearing observed that Kilynn had been attending individual therapy since the end of July 2016 and had recently begun seeing a new therapist closer to home to make it easier for her to continue the service on a long term basis. Kilynn and Nicholas had also completed a parenting class through Boys Town in October 2016, were working on cleaning and organizing the home, and were utilizing a "color behavior chart," similar to the one A.M. had at school. At the April 17, 2017, review hearing, the court found that fair progress toward the permanency goal of reunification had been made. The case plan progress notes at that time reflected Kilynn's continued involvement in therapy, indicated that she needed to complete a second psychiatric evaluation, and showed Kilynn and Nicholas' continued work on cleaning and organizing the home, but expressed concern that Nicholas was doing most of the parenting tasks during visitation.

By the October 19, 2017, review hearing, Kilynn was making good progress toward reunification. The case plan progress notes at that time stated that Kilynn had removed the clutter from her home and had purchased shelves to organize the space, visits had been going well, and Kilynn and Nicholas were participating in individual therapy and parent child interaction therapy (PCIT), which were going well. Kilynn was also taking the children to their social activities, consistently attending the children's appointments, and trying to develop her support system by making new friends. Kilynn's individual and PCIT therapist were attending family team meetings. Kilynn was providing the children with meals during visitation, providing clothes when she could, and helping to provide school supplies. Finally, Kilynn had an appointment scheduled for a psychological evaluation.

The next review hearing was scheduled for April 19, 2018, but it was continued twice and finally held on June 20. At that time, the juvenile court found that "[p]oor inconsistent progress" was being made toward reunification. The court report, originally prepared April 3, indicated that Kilynn and Nicholas had "slid back in the progress made to their home in regards to cleaning and

organizing." The court report and case plan also noted that S.K.S. had returned to the foster home on March 11 with "bug bites," that a dead mouse and "bugs" had been observed in the home, and that Kilynn was showing some resistance to working with family support on various issues.

### 3. TERMINATION MOTION AND TRIAL

On June 19, 2018, the State filed a motion for termination of Kilynn's parental rights. The State alleged statutory grounds for termination under § 43-292(6) (failure to correct conditions that brought children into care) and § 43-292(7) (out-of-home placement for more than 15 of the most recent 22 months) and that termination of Kilynn's parental rights was in the children's best interests.

The termination trial was held November 5 through 8, 2018. Over the course of 4 days, the juvenile court heard testimony from 24 witnesses and received numerous exhibits. The bill of exceptions for the termination trial includes over 1,100 pages of transcribed testimony and 10 bound volumes of exhibits. We have reviewed the voluminous record and summarize the evidence below.

### (a) State's Evidence

#### (i) Condition of Home at Removal

Cassandra Clark was the Department case manager for this case between June 2016 and June 2017 (the third case worker after the initial intake worker and one other case worker). Although not the initial intake worker, she testified briefly about the circumstances of the children's removal in March 2016. Clark indicated that A.M. had missed a significant amount of school and that the school also had concerns about A.M.'s hygiene. A school resource officer attempted to make contact at the home on one of the days A.M. was not in school. The officer was not allowed into the home and was told that A.M. would be to school by the end of the day. However, A.M. never showed up at school that day, "the hotline," was called, and police contacted the residence again. The officer who investigated testified about photographs he had taken of the home, which were received into evidence. The photographs depict accumulated dirty dishes piled on the floor in the bathroom and in the kitchen sink, and accumulations of trash, garbage, cockroaches (both dead and alive), and mold, insect, or animal droppings in other parts of the residence. The officer observed food items that would normally be refrigerated sitting out at room temperature, and he testified to his concern that the insects, which were centered in the kitchen area, were being drawn to the food and garbage. He also noted that the bathroom was unusable and that there appeared to be fresh vomit in the bottom of the bathtub. Based on the officer's investigation and his discussion with a Department worker, a decision was made to remove the children from the home.

#### (ii) Mental Health Evidence

Dr. Joseph C. Stankus, a clinical psychologist, completed a psychological examination of Kilynn in May 2016. Stankus' report shows his diagnostic impressions of bipolar disorder I, most recent episode, manic, moderate; panic disorder; specific learning disorder with impairment in reading; tobacco use disorder, moderate; borderline intellectual functioning; and child neglect,

confirmed, subsequent encounter. Stankus recommended individual psychotherapy and medication management, a parenting course (also recommended for Nicholas), and family therapy, and that the children remain in foster care until Kilynn was able to demonstrate over a longer period that she could keep her house clean, sanitary, and otherwise appropriate.

Dr. Kay Shilling, a psychiatrist, initially treated Kilynn beginning in March 2012; in this case, Kilynn treated with Shilling from May 26, 2016, until May 2017. An exhibit containing Shilling's treatment updates was received into evidence. On June 29, 2016, Shilling reported that Kilynn had been back in treatment and very compliant and motivated since May 26, was regularly taking her medication and showing "a good response," and had "improved considerably" in terms of her "entire mental status." Shilling stated that Kilynn "would be able to parent her children appropriately at this time." Shilling's additional updates reflect similar praise for Kilynn's compliance and progress. On July 26, Shilling stated that Kilynn was responsible and called if a ride was going to delay her for an appointment. In December, Shilling recommended "movement toward less restrictions on visits" and immediate reunification. Shilling continued to report Kilynn's compliance with medication and therapy appointments, as well as her motivation and involvement, in 2017. In her last update letter, dated April 4, 2017, Shilling stated, "My opinion remains that [Kilynn] demonstrates the abilities to parent her children and they should be returned to her home."

Priscilla Wilson has provided therapy for A.M. since December 2016. S.K.S. is not Wilson's client due to age restrictions, and Wilson only sees her occasionally. A.M. had an appointment every week in December and approximately two to three times a month after that, her "regularity" depending on vacations, weather, and whether someone was available to transport her. According to Wilson, while Kilynn was responsible for getting A.M. to her appointments, she was regularly late by 10 minutes and was a half hour late on three occasions. At the time of trial, the foster mother was bringing A.M. to appointments. A.M. has been diagnosed with adjustment disorder with depressed mood. Over the course of treatment, Wilson has seen improvements in A.M.'s appearance in terms of her cleanliness and clothing. Wilson also felt that A.M. had become more confident, secure, and less emotionally needy. With respect to A.M.'s current permanency needs, Wilson testified that A.M. needs to be able to trust and feel accepted, approved of, and validated by her caregivers. Wilson has observed regression in A.M.'s "demeanor, behavior, beliefs . . . coming out in ways that are not socially acceptable" when A.M. "has different hours with [Kilynn] than what she had the month before." Wilson testified to her belief that A.M.'s exacerbated and worsening behaviors during times of increased visitation with Kilynn could be attributable to A.M.'s uncertainty about permanency. Wilson testified that A.M.'s needs for permanency and stability are being met in her current foster placement. Wilson agreed that it would be harmful for A.M. to remain in foster care while Kilynn completed her case plan goals.

*(iii) Department Case Managers*

Clark testified about Kilynn's compliance with the case plan goals during her time as case manager. According to Clark, Kilynn was following most of the recommendations set forth in Stankus' psychological evaluation. Also, Kilynn was consistently seeing her counselor/therapist and had successfully completed a Boys Town Common Sense Parenting class. Kilynn and

Nicholas made progress in cleaning and organizing the home, and the original cockroach infestation was taken care of during the first few months of the case. However, during a visit Clark made to the home in November 2016, she observed that its condition with respect to cleanliness, clutter, and the presence of insects had again deteriorated. This deterioration had not been reflected in the daily session notes from visitation workers. Visits were moved outside the home for a couple of weeks while Kilynn and Nicholas worked with family support to clean the house up again. Kilynn attended all of her visitation and established a hygiene schedule for the children, but Clark noted concerns that Nicholas was handling more of the parenting responsibilities during visits. Clark's court reports reflected that Kilynn made either good or fair progress toward case plan goals, but Clark's testimony at trial indicates that Kilynn was also inconsistent at times in her progress toward the goals and in her engagement with services. During Clark's testimony, the juvenile court received copies of documents from proceedings in Minnesota during 2007 and 2008 in which Kilynn's parental rights were terminated to her two older children (one involuntary termination and one relinquishment).

Robert Ouellette took over as Department case manager on August 18, 2017, and remained case manager at the time of trial. From October 2, 2017, to March 12, 2018, Kilynn's visits were semi-supervised based on Kilynn and Nicholas' improvements in keeping the home clean, but after March 12, visits were pulled out of the home and returned to full supervision. According to Ouellette, these changes were prompted not only by S.K.S. returning to the foster home with a bug bite but also due to an overall deterioration of the cleanliness of the home. However, the daily service notes admitted into evidence did not note any safety concerns regarding the children during this time. And at least one visit occurred at a park on March 9 (where a bug bite could possibly occur). Visits were returned to the home on May 29, after a walkthrough by an exterminator, but they continued to be fully supervised at the time of the termination trial. Ouellette stated that the children were doing well in their placement and in school and were in a very stable, clean environment.

Ouellette testified that Kilynn made minimal progress toward achieving case plan goals during his involvement. He stated that Kilynn had not consistently provided a clean and organized home free from hazards, successfully engaged in family support services, or addressed her mental health issues and medication management. He observed that Kilynn did not attend her medication management appointments between November 2017 and June 2018 and that the cleanliness and organization of the home decreased during that time. Pictures of the home taken by Ouellette on walk-throughs on August 9 and September 28, 2018, were admitted into evidence and show a rice bag that appeared to be chewed open on a shelf with other food items, possible mouse feces, and generally more dirt, grime, and clutter than are reflected in pictures taken on other occasions by Kilynn. Other on-going concerns noted by Ouellette were the amount of mouse feces in the home and Kilynn's difficulties in getting the children to appointments on time. Ouellette also noted that Kilynn had been arrested in September 2018 on a perjury charge in connection with her divorce. According to Ouellette, Kilynn is unable to provide a safe, stable, habitable home for the children and is unable to make sufficient progress with services. He testified that termination of her parental rights would be in the children's best interests.

*(iv) Family Support/Visitation Workers Testifying for State*

The State presented testimony from two employees of Better Living Counseling Services, the provider for family support and visitation services in this case.

Rachael Peterson, a supervisor with Better Living, also provided both family support and visitation supervision in this case between May 2017 and March 2018. She testified that during her involvement in the case, visitation was always semi-supervised or supervised. Visits moved out of the home and into the community and back into the home again several times during Peterson's time on the case. She never felt that there was a point where it was safe for unsupervised or overnight visits to occur. According to Peterson, Kilynn was always consistent in attending visitation (up to 25 hours authorized per week) and often requested additional hours, but she was inconsistent in completing overall case plan goals. Peterson also indicated that Kilynn was sometimes resistant to suggestions and/or services. Peterson felt that during her time as a supervisor, Kilynn was not able to provide a safe and stable environment for the children. During cross-examination, however, Peterson agreed that during the visits she personally observed, Kilynn always made sure the children were fed, provided age-appropriate activities, and close supervision. She also agreed that she never had concerns for the children's safety when they were with Kilynn.

Gailanne Hindsley provided family support services between October 2017 and February 2018. Hindsley worked on a parenting curriculum and appropriate housekeeping skills with Kilynn, and she testified that Kilynn did not successfully complete those goals during Hindsley's time on the case. Hindsley testified that Kilynn did not consistently maintain a clean home and was not receptive to family support, although she consistently attended visitation. During family support sessions, Hindsley was able to observe Kilynn's parenting, and Hindsley testified that Kilynn interacted with the children in age-appropriate activities but that there were times when she treated the children differently. Hindsley believed Kilynn understood the overall safety concerns in maintaining a clean home but she would not consistently remedy these issues.

*(v) Foster Care Review Office*

Brittney Everett, a review specialist with the Nebraska Foster Care Review Office, reviewed the family's case on three separate occasions, most recently in April 2018. In December 2016, the agency recommended a move to semi-supervised visits due to Kilynn's compliance with court-ordered services. In October 2017, the agency recommended a transition plan moving toward placement of the children in the home. However, by April 2018, the agency noted safety concerns due to the inconsistent cleanliness of the home and "started leaning more towards an alternative permanency objective." Everett testified that Kilynn had made minimal progress toward case plan goals. At the time of trial, she felt that Kilynn was unable to meet the children's needs for permanency and stability because the children had been in out-of-home care for over 2 years and that despite the services offered to her during that time, Kilynn had still not demonstrated an ability "to provide stable conditions for the children."

*(i) Pest Control*

The owner of an extermination company testified that the Department asked him to inspect Kilynn's residence for cockroaches, which he did on May 1, 2018. He did not find "any live activity" at the time of his inspection, finding "just a few signs of dead insects, signs of the previous infestation," primarily in the kitchen area.

Kilynn's landlord testified to receiving complaints from tenants at the trailer park beginning in January 2018, which she attributed to rainy weather and trees that had fallen down. The landlord was helping to address the mouse issue by "[b]uying bags of stuff to put underneath of [the trailers] to detour [sic] them from being there."

Nicholas, Kilynn's live-in partner and the children's father figure, testified that he has not seen any cockroaches in the residence since the beginning of 2018 and that they have purchased "[e]lectronic devices that send out a high-pitched noise that only rodents and small animals can hear," which he believes is working to keep out mice.

*(ii) Mental Health Professionals*

Nan Cunningham provided individual therapy for Kilynn from July through October 2016 and then referred her to another therapist in Blair, whose office was closer to Kilynn's residence. Chandra Petersen provided individual therapy for Kilynn from November 2016 through trial. She also provided some family therapy until it was cancelled by the Department case worker in April 2017 and other arrangements were made. Both therapists were aware of Kilynn's diagnosis of bipolar disorder and depression. Kilynn was consistent in attending her appointments with Cunningham, and she attended 95 percent of the scheduled therapy appointments with Petersen. Petersen testified to her belief that the substantial turnover in the Department, visitation, and family support workers and the lack of communication or miscommunication between these workers and Kilynn has contributed to Kilynn's lack of consistent progress in achieving Department and court-ordered goals. She testified that worker turnover and miscommunication have inhibited Kilynn's ability to build needed trust between herself and the numerous people utilized to assist her in reunifying with her children. Petersen testified to her belief that Kilynn has been advised different things by many of the people involved in her case. Initially, Petersen saw Kilynn weekly, but Kilynn's therapy sessions were reduced to once every other week beginning in October 2017 due to Kilynn's overall therapeutic progress. However, in June 2018, after the termination motion was filed, therapy sessions increased due to Kilynn's increased stress and anxiety. Petersen opined that Kilynn's mental health is stable. Petersen has observed an overall improvement in Kilynn's mental health during the course of their 77 therapy sessions.

Kelly Hoover, a physician's assistant at Inroads to Recovery, a psychiatric practice, performed an updated psychiatric evaluation of Kilynn in February 2017 (Kilynn transferred from Shilling to Hoover for medication management after receiving recommendations to find a provider closer to her residence). At that time, Kilynn was diagnosed with "[b]ipolar disorder, current episode depressed, moderate." According to Hoover, Kilynn was on medication and her condition was stable. Hoover saw Kilynn for medication management appointments, initially about every

4 to 6 weeks, and then every 6 to 8 weeks except for the lapse between November 2017 and June 2018. Hoover noted that the Inroads office was closed for a period in September 2017 while it moved to a different location. She also noted that prior to the lapse in treatment, Kilynn was often given medication samples "in excess of what she would need for the time period [before the next appointment]." When Hoover saw Kilynn again in June 2018, she did not have any concerns about Kilynn's stability. Kilynn has seen Hoover consistently since that time, and Hoover testified that Kilynn continued to be mentally stable.

Mary Haskins, a licensed mental health practitioner, provided PCIT for the family from July 2017 to April 2018. During Kilynn's initial interview with Haskins, Kilynn seemed a little frustrated with the children's continued out-of-home placement, but according to Haskins, she seemed willing to do what was needed to reunify with them. Kilynn was consistent in her appointments with Haskins. PCIT consists of two phases: the parent-management program (which involves strengthening the parent's relationship with the child in a clinical setting) and the family-oriented program (which Haskins described as "more of a discipline-type program" and involves the parents implementing skills in the home). Haskins testified that Kilynn did well in the clinical setting with implementing learned concepts, but that she had not yet mastered the skills involved in the second PCIT phase. PCIT became more difficult to conduct in March 2018 when visits were moved outside the home. Haskins' last contact with the family was an individual session in April 2018 with A.M., who was "having some issues at that time." There was also a period in March and April where Haskins was not able to see the family due to her own personal issues. During her involvement with the case, Haskins recommended therapy involving Kilynn, Nicholas, the children, and the foster parents.

*(iii) Family Support/Visitation Workers Testifying for Kilynn*

Kilynn presented testimony from multiple employees of Better Living Counseling.

Noma LeMoine has provided family support and visitation supervision services for the family since December 2016. She testified that there is a strong and positive relationship between the children and Kilynn. On direct examination, she agreed that in the early part of 2018, when the visits she supervised were in the home, it was habitable and sanitary, but after further questioning by the court, she indicated that the home was not consistently habitable and sanitary.

Alyson Ramsey provided family support and visitation supervision between June 2016 and March 2017. She described Kilynn as engaged and open to what Ramsey had to say, and she indicated that Kilynn made progress with cleaning her home, maintaining and addressing her mental health issues, and in working on her parenting skills. Kilynn attended all of her visitation, and Ramsey observed a strong, positive relationship between Kilynn and the children. Although the residence was "somewhat cluttered," she never saw anything that she interpreted as "unsafe for the girls."

Christine Legband provided visitation supervision and then family support between late 2016 and November 2017. Legband assisted Kilynn with monthly budgets, keeping the house clean and organized, and she observed Kilynn's parenting skills. She did not usually need to help Kilynn find community resources as, according to Legband, finding and utilizing such resources is one of Kilynn's strengths. She testified that Kilynn was always cooperative with her and

completed some Department goals. According to Legband, although the home was cluttered, she never observed any cockroaches or mice, and she observed improvement in the condition of the home. Kilynn was consistent with her visits with the children. Legband observed that Kilynn was very sweet and loving to the children and indicated that the girls have a strong and positive relationship with their mother. She did not observe Kilynn exhibiting favoritism and described Kilynn's individual treatment of the girls as "age appropriate."

Justine Erbst supervised Kilynn's case from September 2016 through June 2017. Erbst visited Kilynn's residence two or three times and observed that there "wasn't a bunch of clutter" on those occasions. Kilynn's conversations with Erbst were not always cordial. According to Erbst, Kilynn maintained consistent visitation with the children, and she worked on her case plan goals, although her overall progress on those goals was not always consistent.

Alicia Swain supervised visits in 2016 and had recently supervised a visit in September 2018. She testified that visitation in both 2016 and 2018 went well, and she indicated that Kilynn appropriately disciplined the girls when necessary. William Garvey supervised visits in June and July 2018. He also testified that the visits he supervised went well, although the residence was cluttered, and he observed a mouse dropping "one time in the wardrobe-type closet." He did express some concern that Kilynn showed favoritism to S.K.S. and seemed to be "much more harsh" to A.M.

Heather Bermel began providing ongoing support work shortly before trial. In addition to cleanliness of the home, she had been working with Kilynn on budgeting. Bermel described the home at the time of her first visit as cluttered but with space to move around in. She did not begin helping Kilynn with cleaning until her third or fourth visit, at which time she and Kilynn discovered a large quantity of mouse feces, primarily under the kitchen sink, which Kilynn promptly and appropriately cleaned up. On subsequent visits, Bermel noted progress in Kilynn's ability to clean up after mice as evidenced by [n]ot finding a lot of mouse droppings in the places that had already been cleaned." Bermel has not observed any cockroaches in the residence.

### (iv) Kilynn and Friend

Kilynn testified about the mental health issues she has been diagnosed with since youth and the domestic violence she was subjected to during her marriage to her ex-husband, Kirk. Kilynn testified that she was suffering from severe depression and anxiety after the girls were removed but that she is "motivated to try and get [her] children home." Prior to the children's removal, Kilynn had been on medication for her mental health and had last seen her psychiatrist Shilling in about 2013. Kilynn returned to Shilling after the removal, and Shilling prescribed medication right away. Kilynn indicated that she is taking all medications for treating her mental health conditions as prescribed. Kilynn testified that her mental health has been stable since switching to medication management at Inroads and that it was also stable during the period between November 2017 and June 2018 when she did not attend appointments. She attributed her mental health stability to both her progress in therapy and medication management.

Kilynn believes she has completed case plan goals. On cross-examination, she testified that she does not fully understand the case plan goals. Kilynn has been diagnosed with dyslexia, which she indicated causes her to have trouble or take longer in reading and understanding some

documents, such as some of the parenting class curriculum she was given in this case. Kilynn successfully completed two parenting programs during this case and in June 2017 began expressing interest in re-taking one of the programs. Kilynn testified that when visits were pulled from the home in November 2016, she had not been told by the support workers that the residence was "not up to standard." Kilynn testified to her frustration in worker turnover, indicating that she has been assigned approximately 40 or more Better Living Counseling workers over the course of this case.

Kilynn has lived in the same residence throughout this case, a small two-bedroom mobile home. Kilynn described her home as "clean" with "some clutter of normal items that we use every day." The drive up to the home consists of dirt and gravel, and she testified that these get into the home "[a]ll the time." The court received pictures of the inside of the residence taken by Kilynn on June 26, 2017, and April 4, July 12, August 23, and October 8, 2018. Although there were numerous items in the home on the occasions when the pictures were taken, those items appear reasonably well organized. The home appears livable, although its level of cleanliness cannot necessarily be discerned from the pictures. The pictures taken by Kilynn show a marked improvement over the condition of the home as depicted in pictures taken at the time of the children's removal and generally show a tidier home than on the occasions reflected in the pictures taken by Ouellette.

Kilynn receives SSI disability payments of $751 per month for her bipolar diagnosis, qualifies for $51 a month in "AABD" ("aid to aged, blind, and disabled") cash assistance per month, and receives Medicaid insurance for herself and the girls. Kilynn often relies on Medicaid transportation when she goes outside the Blair community, and she testified to certain issues with getting to appointments, either for herself or the children, if Medicaid transportation does not arrive. She indicated that this sometimes led to rescheduling of her own appointments and that she always informed the girls' therapist and arranged alternate transportation whenever this occurred for the children's appointments.

Jessica Shannon, a friend of Kilynn's for 8 years, testified about her role as one of Kilynn's "positive social supports." She described her observations of Kilynn's interactions with the children and stated, "The kids love her. She's very caring. She does what she needs to do." She observed that the children seem safe and happy when they are with Kilynn.

### 4. JUVENILE COURT'S ORDER ON TERMINATION OF PARENTAL RIGHTS

On February 25, 2019, the juvenile court entered an order denying the State's motion to terminate Kilynn's parental rights. In its detailed order, the court outlined the procedural history of the case and the evidence received at the termination trial. In discussing the procedural history, the court noted that the motion for termination of Kilynn's parental rights had been filed just 1 day prior to that hearing and observed, "It appeared to the Court that this case turned from all parties agreeing that reunification was an appropriate and realistic permanency goal, to one of adoption, based primarily on a bug bite S.K.S. received during a visitation with [Kilynn] and which it was assumed/estimated to have occurred inside [Kilynn's] home." After its recitation of the evidence, the court found that while the State had proved by clear and convincing evidence statutory grounds for termination of Kilynn's parental rights under § 43-292(7), it had failed to prove statutory

grounds for termination under § 43-292(6). The court then concluded that the State had also not proven that termination was in the children's bet interests. In addressing the evidence with respect to best interests, the court stated:

The Court is certainly concerned that [Kilynn] has not consistently made progress in achieving court ordered case plan goals. However, in reviewing the five case plans, offered and received into evidence, regarding [Kilynn's] progress toward achieving [Department] goals, the Court determined that reunification was the permanency goal. The two [Department] case managers [who testified] in this case also found [Kilynn's] overall case plan progress to be 'good' at the dispositional hearing, and them 'fair to better than fair', 'fair', 'good', and the review originally scheduled on April 19, 2018 indicated 'poor' progress, while the case plan submitted to the continued review hearing found [Kilynn's] overall case plan progress to be 'poor inconsistent.' In each of these case plans, prepared for either the dispositional or review hearings, the Court determined that reunification was the permanency goal. The two [Department] case managers, in this case, also recommended reunification as the permanency goal, but for the case plan prepared for the June 20, 2018 review in which . . . Ouellette, recommended adoption. The Court also believes that [Kilynn's] mental health issues, including being bipolar, and suffering from depression and anxiety has contributed to [Kilynn's] overall lack of consistent progress, although there have been times, when she's made significant progress. [Kilynn] is also a good and loving mother and cares deeply for her girls. She was always consistent with her visitations and, in fact, consistently requested more visitation time with them. And, there is no question that A.M. and S.K.S. have a strong and loving bond with their mother too. The Court also believes that a lack of a consistent voice in assisting [Kilynn] during visitations is also a contributing factor in [Kilynn's] overall inconsistency in meeting case plan goals. Mental health practitioner and therapist for [Kilynn] Chandra Petersen testified to the same thing. And [Kilynn] testified that she has been assigned forty or more Better Living Counseling workers since the beginning of this case. The Court simply finds that the State has not proved it would be in A.M.'s and S.K.S.'s best interests to have their mother's parental rights terminated, nor has the State proved that [Kilynn] is an unfit parent.

The State subsequently perfected its appeal to this court.

### III. ASSIGNMENTS OF ERROR

The State asserts that the juvenile court erred in failing to find clear and convincing evidence that (1) Kilynn's parental rights should be terminated pursuant to § 43-292(6) and that (2) termination of her parental rights was in the children's best interests.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Reality W.*, 302 Neb. 878, 925 N.W.2d 355 (2019). When the evidence is in conflict, however, an appellate court may give weight

to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018).

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

The State asserts that the juvenile court erred in failing to find clear and convincing evidence that Kilynn's parental rights should be terminated pursuant to § 43-292(6).

In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Zachary D. & Alexander D.*, 289 Neb. 763, 857 N.W.2d 323 (2015). In this case, the juvenile court found grounds for termination of Kilynn's parental rights under § 43-292(7), but it found that the State had not proven by clear and convincing evidence grounds for termination under § 43-292(6). Upon our de novo review, we find that the State presented clear and convincing evidence to support termination of Kilynn's parental rights under § 43-292(7). Proof of one statutory ground is needed for termination, and the record clearly shows that statutory grounds for termination of her parental rights exist under § 43-292(7).

Section 43-292(7) provides grounds for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The children were removed from Kilynn's care on March 4, 2016, and have been in an out-of-home placement continuously since that time. The motion to terminate Kilynn's parental rights was filed on June 19, 2018, at which time the children had been in out-of-home placement for more than 27 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Kilynn's parental rights under § 43-292(7) were proven by sufficient evidence.

The State assigns error to the juvenile court's failure to also find sufficient evidence to support termination under § 43-292(6), but we do not need to consider whether termination of Kilynn's parental rights was proper pursuant to that subsection since § 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Audrey T.*, 26 Neb. App. 822, 924 N.W.2d 72 (2019). However, we will consider evidence relevant to § 43-292(6) in our analysis of best interests. Generally, when termination of parental rights is sought, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re J'Endlessly F. et al.*, 26 Neb. App. 497, 920 N.W.2d 858 (2018).

### 2. BEST INTERESTS

The State asserts that the juvenile court erred in failing to find clear and convincing evidence that termination of Kilynn's parental rights was in the children's best interests.

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A

parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Jahon S., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.*

We have recounted the evidence received over the course of the 4 day trial above and do not repeat it here. In general, Kilynn made reasonable progress on her case plan goals with setbacks in progress at the end of 2017 and again in mid-2018. Her mental health issues certainly have played a role in these lapses in progress, but she has completed the required evaluations, has been consistent in attending individual therapy, and returned to medication management appointments after her lapse in attendance. It is not clear whether Kilynn was completely without medication during the period between November 2017 and June 2018 as she had received extra medication samples from Hoover and may have also received some medication from Shilling. When Kilynn returned to her appointments, Hoover found her to be stable. Kilynn has consistently attended visitation and she and the children have a strong bond. While there were concerns at certain points that Nicholas was performing a greater share of parenting tasks during visits, a review of the highly detailed session notes for visitation shows that Kilynn performed her fair share of parenting during visitation. Given that Nicholas and Kilynn are in a committed relationship and the children view him as a father figure, it is to be expected that both Kilynn and Nicholas would perform parenting tasks during the visits which they both attended.

One concern in this case, as noted by the juvenile court, has been the number of case managers and family support and visitation workers. A review of the record shows that there were inconsistencies in the way workers' observations were documented during visits and family support time and not every worker (or even Kilynn) was necessarily given a clear picture of what was expected in terms of a clean home. As noted by the children's guardian ad litem in her appellate brief, the Nebraska Supreme Court has stated that poor housekeeping, alone, is not a sufficient basis for terminating parental rights; it has also stated that where poor housekeeping degenerates into a continuing health hazard, the best interests of the children require termination of parental rights. See *In re Interest of E.R., J.R., and A.R.*, 230 Neb. 646, 432 N.W.2d 834 (1988). See, also, *In re Interest of Lisa W. & Samantha W.*, 258 Neb. 914, 606 N.W.2d 804 (2000). However, those cases are distinguishable from the present case. Certainly, children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S., supra*. While Kilynn's progress has not always been consistent during the period

of the children's out-of-home placement, it is also clear that after sitting through 4 days of testimony from multiple witnesses and wading through the voluminous documentary evidence in this case, the juvenile court issued a lengthy, thoughtful opinion finding that termination of Kilynn's parental rights was not in the children's best interests. In doing so, the court made certain judgments about the conflicts in the evidence presented, and we give weight to that fact. See *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). Based upon our de novo review of the record, we cannot say that the juvenile court erred in finding that termination of Kilynn's parental rights was not in the children's best interests.

## VI. CONCLUSION

The juvenile court did not err in finding that the State proved grounds for termination of Kilynn's parental rights under § 43-292(7). Nor did it err in finding that the State failed to prove that termination of her parental rights was in the children's best interests.

AFFIRMED.