IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF JOHN J. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF JOHN J. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

TARA C., APPELLANT, AND BYRON J., APPELLEE AND CROSS-APPELLANT.


Filed December 10, 2019.    No. A-19-178.


Appeal from the Separate Juvenile Court of Douglas County: ELIZABETH G. CRNKOVICH, Judge. Affirmed.

Kenneth Jacobs, of Jacobs Alexander Law, for appellant.

Mark Hanna, Deputy Douglas County Attorney, for appellee State of Nebraska.

Thomas C. Riley, Douglas County Public Defender, Claudia L. McKnight, and Reilly White, Senior Certified Law Student, for appellee Byron J.


PIRTLE, RIEDMANN, and WELCH, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Tara C. appeals, and Byron J. cross-appeals, from an order of the separate juvenile court of Douglas County terminating their parental rights to six minor children. Based on the reasons that follow, we affirm the order of the juvenile court.

- 1 -

## II. BACKGROUND

Tara and Byron have six minor children together: John J., born in 2001; Nathaniel J., born in 2004; Kaytlynn J., born in 2007; Paityn J., born in 2008; Conner J., born in 2011; and Giovanna J. (Gia), born in 2016. On November 4, 2016, law enforcement was called to the home of Tara and Byron and observed the home to be "in a filthy, unwholesome condition placing said children at risk for harm." Soon after, the State filed an ex parte motion for immediate custody requesting that the children be placed in the temporary custody of the Nebraska Department of Health and Human Services (DHHS). That motion was granted and the children were placed in the custody of DHHS. After a number of hearings and orders on the matter, the State ultimately filed a motion for termination of parental rights and second motion for termination of parental rights in regard to Tara and Byron. Trial on both motions took place over 3 days on October 29, December 3, and December 6, 2018.

The State's first witness, Erin Noland, testified that she has known Tara since 1996 and the two attended high school together. At the time of trial, Nathaniel and John were residing with Noland. Both were first placed with Noland in November 2016, but John was removed temporarily in early 2017. The other four children briefly resided with Noland for a period of 2½ weeks in December 2017.

Noland testified that at the time Nathaniel was first placed in her home by Child Protective Services (CPS) he was 12 years old and unable to read or write, but has since excelled. She testified that Nathaniel has an Individualized Education Program (IEP) and that Tara attended the initial meeting associated with the IEP, but Byron did not. Noland testified that Nathaniel's supervised visitation with Tara was initially twice a week but was suspended in April or May 2017. Separate supervised visitation with Byron was also initially scheduled for twice a week but was later suspended.

Noland noted that she is responsible for coordinating medical, dental, and vision appointments for Nathaniel. Since Nathaniel entered Noland's care, Tara attended two medical appointments when he broke his leg, and Byron attended one. Noland testified that since their visitation was cancelled, neither Tara nor Byron have contacted her to check on the well-being of Nathaniel. When visits were ongoing, both parents would communicate with Noland and Nathaniel.

On cross-examination, Noland testified that she was unaware of whether Byron was notified of Nathaniel's IEP meeting and that she did not notify him of medical appointments because he did not have a phone at the time. Noland testified that she has never had any concerns for the well-being of Tara and Byron's children. When Nathaniel and John were initially placed in Noland's care, John refused some of the first visits with Byron, but eventually began attending.

Gisela Lacy, a temporary kinship foster parent, testified that four of the six children were placed in her home between late December 2017 and June 2018. Lacy testified that after each visit with Tara, the children would return upset, slam doors, and avoid talking. These behaviors were less prevalent after visits with Byron, but still occurred. After visits with Byron, the children would smell like cigarette smoke. After visits with Tara, Gia would often have a soaking diaper and a bad

diaper rash. Gia would also come back wearing clothes that were too tight to the extent they "were almost like hurting her" and left marks.

Lacy testified that neither Byron nor Tara attended any of the children's appointments, despite her communicating the appointments to the caseworker. Each of the school-age children--Connor, Kaytlynn, and Paityn--had one IEP meeting while in Lacy's care. However, Tara and Byron only attended Connor's, which was on his birthday, and arrived 15 minutes late. Lacy also testified that prior to placement in her home, the three school-age children had never attended public school and could not read or write, despite being 6, 9, and 10 years old.

Lacy further testified that on one occasion, the three oldest children came back from a visit with Tara with cellphones, despite a PromiseShip rule that prohibited the children having such. When Lacy took the phones from the children, Tara apparently called Lacy screaming at her, threatening to call the police, and accusing her of stealing. The police ultimately were dispatched to Lacy's home, whereafter Lacy blocked Tara's phone number and did not communicate with her after the incident.

On cross-examination, Lacy testified that while the children were in her care she was to make them available for family therapy, but that the therapy never occurred due to transportation issues. Lacy was willing to transport the children to therapy, but was not willing to have it take place in her home and did not want to be confronted by Tara after the previous cellphone incident.

Erica Austin, a supervisor at Capstone Behavioral Health, testified that she supervised Tara's drug testing for approximately the year leading up to trial. Austin prepared and testified regarding a document outlining Capstone's involvement with Tara over that year. A number of Tara's drug tests came back "presumptive positive for benzo." On cross-examination, Austin testified that the individual administering the drug tests would have had a list of Tara's prescriptions, and although each column within exhibit 52 did not indicate Tara had a prescription for benzodiazepines, it was possible that she had a prescription at the time of each positive test. She further testified that she would not have information that would reveal whether the levels of benzodiazepines discovered were in accordance with any existing prescription.

Rachel Peters, John's juvenile probation officer, testified that throughout her year and a half as John's probation officer, John spent time at the Douglas County Youth Center (DCYC), Canyon State in Arizona, and a kinship home placement with Noland. Peters testified that her only interaction with Tara was a phone conference family team meeting while John was at Canyon State. She testified that it was concerning that Tara discussed John coming back to live with her, when that was not something that was going to happen. She testified that because John was a ward of the State, she was up-to-date on court orders pending for him. It was her understanding that there was a no contact order between John and Tara and Byron, and that it was concerning that Byron attended one of John's probation hearings.

On cross-examination, Peters testified that John's guardian ad litem did not mention a no contact order on the phone meeting while John was at Canyon State, but did express concern when Tara began discussing John coming back to live with her. She further testified that what she believed to be a no contact order could have been a no visitation order instead. Peters also testified that John was frustrated he was unable to take advantage of an earned visit with either Tara or

Byron because of a court order, but that "he also understood that those circumstances were outside of his control."

Dylan Best, a family support specialist, testified that he supervised visitation for Byron from January to October 2017, and Tara from February to June 2017. Best testified that during his time supervising Byron's visits, he never had any major safety concerns, but did raise concerns with the language Byron used with the children. During one visit, Byron had apparently told one of the children to "shut up." Best testified that Byron did not always take redirection well and would tell Best it was not his job to parent his children. Best also testified that at times, Byron would appear frustrated taking care of the children, but that he did not believe it to be an overreaction given the number and age of the children. Over the course of his supervision, Best acknowledged three visitation dates that were cancelled due to weather or Byron not feeling well.

Best testified that he also worked with Byron on family support goals, obtaining employment, and arranging a batterer's intervention course and chemical dependency evaluation. Best testified that Byron located temporary employment with a sanitation company, did not complete the batterer's intervention course in the 9 months he worked with him, and Byron self-reported that he completed the chemical dependency evaluation.

Best testified that most of Tara's visits took place at a neutral location, and never at a family home. Best testified that at times Tara appeared overwhelmed on the visits, and the children would sometimes talk back, but in his opinion she was still able to parent. He noted that Tara sometimes appeared frustrated with the children from her body language and, occasional harsh language. Best testified that, of the visits he supervised, one visit was cancelled by Tara between February and June 2017.

On cross-examination, Best testified that Byron would provide meals for the children and that visits would occur at the library, Children's Museum, Do Space, and various parks. On visitations, Byron would interact with all the children. Best testified that while he was working with Byron, Byron was staying at the Siena Francis House and later at a friend's apartment. Best noted that Byron ultimately enrolled in a batterer's intervention program near the end of his time working with him. The chemical dependency evaluation was not completed until June. Transportation and cost played a role in the delay. Best testified that Byron made comments that he did not feel the need for the batterer's course and any accusations against him were not true, but that he nevertheless worked on completing the course.

Tia Scheel, a CEDARS family support specialist on the case between August 2017 and April 2018, testified that she supervised visits with Tara during that time. Scheel testified that she occasionally had concerns about Tara's ability to parent all of the children at once, but only on a few occasions where Tara would speak negatively about the foster parents. On one occasion, Tara became upset that a foster parent expressed concern about Gia's diaper rash and Tara angrily responded, "I don't give a shit about what diapers Jodee uses and you can tell her I said just that." Similar comments occurred on a few other occasions. At times, Tara was open to redirection, but other times she appeared exasperated by it. Tara also referred to the CEDARS workers as "babysitters" and did not believe she needed their supervision.

Scheel testified that it was her understanding Byron was not to be on Tara's visits, but that she and the children would occasionally see him when picking up Tara for visitation. Scheel did

not have any knowledge of whether or not Byron was staying with Tara at her friend's home. In April 2018, visits were suspended and Scheel stopped working with the family.

On cross-examination, Scheel testified that Tara moved into her own home sometime around April 2018 and that the home had been approved for visits by the case worker, Jessica Hofmann. She testified that the few visits that occurred within the home "calmed down a little bit" and it was easier for Tara to supervise the children compared to previous visits in public locations. She further noted that the diaper rash Gia developed was an ongoing issue and may not have been something that developed on a visit with Tara. Scheel testified that while she supervised visits, Tara's parenting skills had been improving up until visits were suspended in April 2018.

Scheel testified that some of Tara's friends--Dave, Amber, and Dave's niece Sam-- attended several visits and were originally approved by PromiseShip until that was revoked around March, 2018. Their approval was revoked due to continued attempts to intervene and help Tara parent on the visits. Scheel testified that Tara would often become upset on visits and would occasionally yell in response to the children's behaviors or things they would say occurred at their foster homes, such as that Gia was sleeping in the basement alone. On one visitation, in December 2017, Tara found out the children had been removed from their foster home due to speculation of drugs being in the home. In response, the children were upset and did not want to leave with Scheel to the new foster home. Scheel had to talk to Tara separately and redirect her to calm down and appropriately approach the children. On another visit, Tara became upset with Connor and began to yell at him in a Dollar Tree. Scheel approached Tara in order to move the situation outside.

Tia Wetzel, a CEDARS family support specialist on the case between January and April 2018, testified that she supervised visitation between Tara and the children. She testified a majority of those visits took place at the home Tara was living at with her friends, Dave and Amber. On a visit in late December 2017, Wetzel observed the children texting Byron despite the fact the visits were separate and they were not supposed to be contacting him. In response, Tara took the phones from the children. Wetzel testified that despite the fact Dave, Amber, and Sam were present on several visits, Tara was doing most of the parenting. Occasionally, the others would step in to assist. At times, Wetzel had concerns about Tara's parenting abilities, largely due to a brain aneurysm Tara had. As a result of her stay in the hospital, visits decreased.

On cross-examination, Wetzel testified that she was unaware why her services were ended in April 2018. Wetzel testified that the PromiseShip caseworker had informed her that Tara and Byron were not supposed to have contact with each other and that visits were to be separate. She noted that Tara was attempting to abide by that order when she took away the children's phones on the visit because they were texting Byron. Wetzel conducted two or three visits in the home Tara and Byron rented together in March 2018, shortly before visitation was suspended. Wetzel testified that Tara spent at least 1 week in the hospital due to her brain aneurysm and that the children were brought there to visit her.

Wetzel testified that she could not recall any instances where she had to redirect conversations between Tara and the children, but occasionally noticed Tara become frustrated. When Tara became frustrated, she "was usually able to breathe through it and redirect herself." Wetzel also testified that she observed Tara smoking at least two cigarettes every visit and drinking coffee, despite her doctor's request that she decrease the amount of caffeine she consumed,

cigarettes smoked, and her stress level. Wetzel testified that when Tara went out to smoke, she would leave the door cracked open and supervise the children from outside. Wetzel did not find the smoking to be inappropriate so long as it was not inside in the home.

Alisha Lohman, a case manager with PromiseShip, testified that she prepares a case file for each child she works with containing information about meetings with parents and children, and documentation from providers of services such as family support, therapy, and parenting time.

Lohman was assigned as the family permanency specialist of this case from November 2016 until March 2017. She testified that the children entered foster care as a result of police being called to the home and finding it to be in an "extremely filthy" condition. Lohman testified that the family had multiple prior intakes over the span of 15 years and had been offered noncourt services through PromiseShip prior to the children entering State custody.

Lohman testified that when she took on the case, none of the children had ever been enrolled in school and their educational needs were not being met. Nathaniel, Kaytlynn, Paityn, and Connor all required IEPs. Despite being in fifth, third, and second grade, none of the school-age children could read, and all experienced social anxiety transitioning into the school environment. Tara had apparently been reporting to other professionals that the children were being homeschooled. Prior to transitioning off the case, Lohman noticed positive changes in the children's education, such as excitement about reading books and the ability to attend school all day without the social anxiety.

Lohman testified that she set up individual and family therapy for the children to address the social anxiety and reports of witnessing domestic violence within the home. Family therapy was set up with the children and Tara in order to repair their relationship. Nathaniel and John had previously voiced some concern about returning home with their parents, with John at one point telling the guardian ad litem that it was not in his best interest to return home to either Tara or Byron. Family therapy was not set up with Byron because, at the time, there was the possibility of a protection order against him, and Lohman preferred Byron be involved in individual therapy before recommending family therapy for him. Lohman testified that Tara consistently participated in family therapy.

Lohman first made contact with Byron in late November 2016 and met with him in person after Tara had filed a protection order as a result of reported domestic violence. Tara cited an incident the previous year where she received a black eye and Byron had "called her several names and she felt unsafe around him." Lohman testified that it was "murky" whether she was able to set up parenting time with Byron because the children were encompassed within the protection order. Parenting time was set up after the protection order was dismissed. Lohman testified that the alleged domestic violence was the reason for keeping Tara and Byron's visits with the children separate. In response to Lohman's concerns regarding the domestic violence, Byron repeatedly denied any domestic violence in his and Tara's relationship. In January 2017, Byron told Lohman that he and Tara were back together and living together.

During her time on the case, Lohman did not receive any reported concerns from the CEDARS workers supervising Byron's visits. Byron, at the time, did not have a stable home or source of income. The children were adjudicated on January 19, 2017. At the dispositional hearing, the court ordered that Byron participate in a chemical dependency evaluation, an initial diagnostic

interview (IDI), a batterer's intervention course, a parenting class, obtain and maintain a legal source of income, and obtain and maintain safe and stable housing. While Lohman was on the case, Byron completed the parenting class but had not enrolled in a batterer's intervention course, completed an IDI, or completed the chemical dependency evaluation.

In December 2016, Tara's visits were decreased from five to three weekly visits due to inconsistent attendance. Visits decreased from three to two per week in February 2017 due to Tara's failure to consistently call to confirm the visits. By the time Lohman transitioned off the case, she still had concerns with Tara's ability to parent. Lohman testified that Tara at times would whisper to the children so the supervisor could not hear what was being said and would tell them that they would be coming home within a certain time frame.

At her dispositional hearing, the court ordered Tara to complete a chemical dependency evaluation, follow the recommendations of her IDI, complete a parenting class, participate in a Foundations course at the Women's Center for Advancement, obtain and maintain an income and stable housing, and participate in supervised visits with the children. By the time Lohman transitioned off the case, Tara had not completed the chemical dependency evaluation and was enrolled in but had not completed the Foundations course. Tara was following the IDI recommendations and had completed the parenting course. She also had been applying for work, but did not have a source of income. She did not have a stable home.

Lohman testified that she continued to have concerns regarding domestic violence, namely because Tara and Byron were living together, Tara continued to deny any domestic violence had occurred, and some of the children had reported incidences of domestic violence in the home. In January 2017, John reported that he did not feel safe around his parents and said that he had been pushed through a window by Byron.

Byron indicated in December 2016 that he was on probation as a result of taking anxiety medications and driving. He did not complete a chemical dependency evaluation prior to March 2017, but was getting tested by his probation officer, and the tests came back clean.

On cross-examination, Lohman testified that Tara had repeated issues with one set of foster parents, with "name calling" and "defamatory statements" being made between them. Eventually, the children were removed from that home due to reported cocaine use. Lohman testified that the Foundations class is typically 8 weeks and that Tara voluntarily began the class before it was court-ordered at the disposition hearing. She also had begun the parenting class, completed her IDI, and was participating in supervised visits before they were court-ordered.

Lohman testified that the protection order against Byron was dismissed by the court because there was not substantial evidence to continue it. She also noted that Byron was never charged or convicted for domestic violence.

Heather Duhacheck-Chase, a therapist with Generation Hope, testified that she began seeing Nathaniel, Paityn, Kaytlynn, and Connor for therapy in December 2016 and has been their active therapist since. She testified that the children were initially referred for individual therapy by PromiseShip due to having been removed from their home and concerns about domestic violence. Duhacheck-Chase noted that she provided individual therapy to Tara between December 2016 and August 2017, who was referred by PromiseShip due to the domestic violence concerns.

Therapy was discontinued in August 2017 due to the fact that PromiseShip did not want to continue paying, and Generation Hope was unable to lower their rate.

Duhacheck-Chase testified that she provided family therapy for Tara and the children between January and October 2017, and again between June 30 and August 6, 2018. She only provided one family therapy session involving Byron in July 2018. Duhacheck-Chase testified that her IDIs with the children revealed symptoms of social anxiety and other adjustment and depressive symptoms. At Tara's IDI, she displayed similar symptoms of anxiety and adjustment with depression.

Duhacheck-Chase noted that Tara informed her that at times Byron "could be controlling and possessive, aggressive towards her and the kids." Duhacheck-Chase testified that during her 2017 sessions with Tara it was her understanding that Tara and Byron were separated, but when family therapy resumed in 2018 they had reportedly "worked through everything" and were back together. Duhacheck-Chase testified that during their sessions, Tara had been working on a domestic violence workbook that ultimately was finished in June 2018 when she was discharged from therapy.

Duhacheck-Chase testified that the family therapy sessions would often take place in public places in the community and that she never had any concerns with Tara's participation in the sessions. She noted that Tara was active in therapy and wanted to know how the children were doing in individual sessions, and that she often does not see that from other parents. She testified that family therapy sessions ended in October 2017 due to transportation issues with the children that were never resolved by PromiseShip. Duhacheck-Chase testified that she was not provided a reason for why family therapy ended in August 2018 and that it would be her recommendation that the sessions continue for both parents.

Duhacheck-Chase testified that in her sessions with the children they all expressed their disapproval of their parents' fighting, and that they wanted to go home only after knowing that "there was lights and food and their parents weren't fighting." At one point, before the last family therapy session, the children expressed that things were going well and they were ready to go home.

On cross-examination, Duhacheck-Chase testified that at the time Tara's sessions stopped due to the payment issue, her symptoms were low enough where she could have been discharged and it deemed successful. Nevertheless, Duhacheck-Chase still wanted to, and did, evaluate Tara in the family therapy setting. She testified that the transportation issues caused Nathaniel to regress because he was upset that the other children were able to see the parents and he was not. She testified that it is "obviously not ideal" to do family therapy sessions in public places, but they made it work. In July 2018, Duhacheck-Chase visited Tara's home and found that it would have been suitable to hold therapy sessions in. She further testified that it was her opinion that visits and therapy inside the home would have been easier than in public locations. She noted that the environment was often difficult to manage, but that she thought anybody would have a difficult time managing "that many kids that age in Wal-Mart" but she did not observe any inappropriate parenting.

Duhacheck-Chase testified that progress in the 2017 sessions was slower due to everyone adjusting and a lot of emotion, but that things were getting better as time went on. She testified

that the summer 2018 sessions were much better and "very apologetic" in the sense that "the parents were very humble with their kids, and they were able to apologize for what they'd done and take accountability for what they'd done." The children were surprised that Byron apologized to them and they were grateful that he did.

She testified that she believed that Tara and Byron were trying to tell the children that they were sorry for the way things were in the past and that things were different, and that message got back to PromiseShip and was taken as telling the children they were going to come home. She testified that she was not given any other reason for sessions ending. She also noted that she made a request to the PromiseShip worker for a transportation company to bring the children to sessions, because they had arranged that in the past, but it was never done. Duhacheck-Chase testified that she believes it would be beneficial for both Tara and Byron to participate in family therapy based off of the progress she saw in the 2018 sessions and indicated "they were all moving in a really good direction."

She testified that if visits were in fact so escalated and chaotic that they were suspended, she would be interested in reviewing those reports. She also testified that there were times when Tara made specific comments about reunification to the children, but that those timelines never played out. She noted that it made the children sad and disappointed.

On redirect examination, Duhacheck-Chase testified that it does not concern her how long it took Tara and Byron to progress and take accountability for their previous actions because they went so long without sessions that she is unable to know when that realization actually occurred, and that the summer 2018 session was the first opportunity to have that conversation in nearly a year.

Lindsay Longwell, a PromiseShip family permanency supervisor on the case between May 2017 and November 2018, testified that she assessed permanency objectives and best interests of the cases she was supervising on a daily basis. She testified that the children saw significant improvement in their educational needs while in foster care. Longwell also noticed improvement in social skills and reduced anxiety from their participation in individual therapy. When Longwell became supervisor, she insured that all court-ordered services were set up or referred for Tara and Byron.

Longwell testified that she found it concerning that Tara did not complete her Foundations course during the time she supervised the case because it led her to believe there was a risk for further domestic violence in the future. Longwell also expressed concern that Tara had tested positive for alcohol, benzodiazepines, and opiates. Tara attempted to explain the diluted tests for alcohol by saying it was related to cough medicine or consuming a large amount of energy drinks. Tara also had, at times, been prescribed medications that would test positive for opiates and benzodiazepines.

Longwell indicated that Tara completed her required parenting class in June 2017 and was consistently employed during the time she supervised the case, except for a period of time in December 2017 when she experienced medical issues. Tara did not maintain consistent and stable housing.

Longwell testified that she had concerns that she never had a clear understanding of what the relationship between Tara and Byron was, especially with the potentially aggressive and

violent history and the effect that could have on the children. Longwell also found it concerning that Tara and Byron did not obtain a home until March 2018. Longwell testified that visits were suspended "due to ongoing concerns of supervision, following the rules of supervised visits, and just general chaos that was occurring." She also noted that some visits were ended early and the police had to be called on a few occasions.

Longwell testified that Byron completed all of his court-ordered urinalysis testing, which came back clean, as well as his parenting class. When Longwell first began supervising the case, there was a long period where Byron was not employed to her knowledge, but he did maintain consistent employment later on. Byron did not complete, or sign up for, a batterer's intervention course throughout Longwell's time on the case. Longwell testified that Byron's visits were suspended due to concerns regarding his ability to supervise all of the children at once and consistently provide for their needs.

Longwell testified that based on her interactions with the family and reports from Hofmann and other documentation, it was her opinion that it would be in the children's best interests to have both Tara and Byron's parental rights terminated.

On cross-examination, Longwell testified that she made a recommendation for Apex integrated foster care, where foster parents provide care both to the children and the parents, particularly when housing is the only barrier. She testified that Tara was approved for the program in the fall of 2017. She also testified that she received reports from the family therapist, Duhacheck-Chase, indicating that positive progress was being made. Longwell acknowledged that the June 2017 court order did not require Tara to abstain from alcohol. She testified that PromiseShip did not recommend a suspension of visitation.

Longwell testified that Byron completed the batterers' intervention program 1 to 2 months prior to trial. She testified that PromiseShip did not recommend the suspension of Byron's visitation. She testified that the most significant changes with the children's social skills occurred in the 6 months preceding trial. She noted that despite Tara briefly moving to unsupervised visits in November 2017, her visits returned to supervised after reports that Byron had showed up to one of the visits despite an order that visitation remain separate. She testified that the changes in visitation caused the children to act out more and become increasingly anxious. Longwell further testified that the provider of Tara's alcohol tests indicated large amounts of energy drinks would not cause a positive test and that consuming cough medicine was unlikely to produce those results.

Hofmann, the family permanency specialist on this case from September 2017 through trial, testified that she received training on when it is appropriate to support and recommend the termination of parental rights. She testified that she looks at the length of time that children are in foster care, the parents' compliance with court orders, and the lack of progress during the time PromiseShip is involved with the family.

Hofmann testified that the children have been state wards since November 4, 2016, and have not returned to the home of either Tara or Byron in that time. Hofmann noted that since 2004 there has been eight prior intakes involving the family, including allegations of domestic violence against Byron and concerns that the children were not being appropriately homeschooled.

Hofmann testified that the educational needs of the children have improved since November 2016 when they entered foster care. Hofmann testified that she attended the IEPs of

Nathaniel, Connor, and Kaytlynn, and that Tara was in attendance at all three and Byron attended Connor's and Kaytlynn's. She noted that she received updates from the children's therapist, Duhacheck-Chase, regarding their therapeutic progress and relies on that information in formulating her opinions and recommendations regarding the termination of parental rights.

Hofmann further testified that when she received the case she insured that all court-ordered services were set up or referred for both Tara and Byron. Hofmann testified that when visitation was suspended in April 2018, she had concerns regarding Tara's level of supervision and focus on the children, that Tara was not following the redirection of the visitation workers and was not allowing the children to leave some visits, that the police and CPS after-hours hotline were called by PromiseShip, and that Tara was talking negatively about caseworkers. She testified that since visits were suspended, the children have begun to listen to and be more open with foster parents, are more comfortable within the home, and are happy overall.

Hofmann testified that when Byron's visits were suspended in April 2018, there were concerns that he was overwhelmed and did not know how to manage five children at one time and that he would tell Nathaniel he did not need to attend visits if he continued to act out. Hofmann further testified that she does not believe the domestic violence concerns between Tara and Byron were addressed appropriately, particularly due to the amount of time it took Byron to enroll in the batterers' intervention program and her belief the two were not separated during the period they said they were.

Hofmann testified that based on service reports, interactions with the parents and children, the time the children have been in foster care, and the lack of progress, it was her professional opinion that it was in the best interests of the children that the parental rights of both Tara and Byron be terminated.

On cross-examination, Hofmann testified that despite a written court order for visitation rights for Tara, she did not provide any visits in May or June 2018 due to a separate verbal order that visits were to be suspended. Hofmann testified that in her October 2017 court report, she requested Tara move to unsupervised visits. Hofmann testified that she visited the home Tara and Byron obtained together on a few occasions, that the home would have been an appropriate place for visits to occur, and that she did not request visits be suspended in April 2018.

Hofmann further testified that despite there being eight prior intakes involving the family, none were substantiated such that they ended up in court. She testified that the May 2018 order for visits also applied to Byron, but those visits never occurred due to the previous verbal order in April 2018 suspending visits. Hofmann testified that while she remained on the case there had been no family team meetings including Byron, and she was unable to explain why, but noted she met with him individually monthly.

After the State rested, Byron called Antoinette Bell, his individual therapist, who testified that Byron came to her for therapy in April 2018 and that she saw him for four sessions. She testified that based on the information she received from Byron, she did not feel there was any need for him to continue sessions beyond that point. In June 2018, Bell sent a report to Hofmann regarding Byron's attendance of therapy and what was done during those sessions.

On cross-examination, Bell testified that Byron indicated there was an open CPS case and that he was court-ordered to attend individual therapy. He did not indicate he had prior issues related to domestic violence, and Bell did not receive any collateral information to suggest such.

In closing, counsel for Tara argued that the State did not meet its burden in showing that it was in the best interests of the children to have her parental rights terminated. Counsel also argued that based on the lack of visits and family team meetings, DHHS did not provide reasonable efforts to reunify the parents with the children.

Counsel for Byron argued that the State had not met its burden, namely because Byron had completed all of the court orders required of him.

## III. ASSIGNMENTS OF ERROR

Tara assigns, restated, that the juvenile court erred in (1) determining there was jurisdiction to terminate her parental rights while an appeal was pending, (2) finding sufficient evidence to support termination under Neb. Rev. Stat. § 43-292(2) (Reissue 2016), (3) finding sufficient evidence to support termination under § 43-292(6), and (4) finding that termination of her parental rights was in the best interests of the children.

Byron cross-appeals, assigning, restated, that the juvenile court erred in (1) determining there was jurisdiction to terminate his parental rights while an appeal was pending; (2) finding sufficient evidence to support termination under § 43-292(2), (6), and (7); and (3) finding that termination was in the best interests of the children.

## IV. STANDARD OF REVIEW

A jurisdictional issue that does not involve a factual dispute presents a question of law. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015).

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016).

## V. ANALYSIS

### 1. JURISDICTION

Both Tara and Byron first argue that the juvenile court was without jurisdiction to hear the State's motions for termination of parental rights. In August 2018, Tara filed a motion for supervised visitation, which Byron sought to join. At the subsequent hearing, the court refused to acknowledge such as a joint motion, so Byron's attorney made an oral motion for supervised visitation. Both motions were denied. Tara and Byron subsequently appealed the denial of the motions. Both also filed motions to continue the pending termination of parental rights trial scheduled for October 29, 2018. On the date of trial, those motions were argued before the juvenile court and were denied. The juvenile court noted in its ruling:

[F]or an appellate court to acquire jurisdiction of an appeal there must be a final order entered by the Court from which the appeal is taken. Juvenile court orders that temporarily

suspend a parent's custody and visitation rights do not affect a substantial right and are, therefore, not appealable. The extent of the juvenile court's jurisdiction over a juvenile while an appeal is pending must be determined by the facts of each case. We are going to continue to hear evidence today whether the court takes the final ruling under advisement or not.

On June 25, 2019, we dismissed both appeals for lack of jurisdiction. See *In re Interest of John J. et al.*, No. A-18-911, 2019 WL 2591075 (Neb. App. June 25, 2019) (selected for posting to court website). We found that because the juvenile court's orders suspending visitation were merely temporary, with reunification as the permanency plan, the orders did not affect a substantial right and therefore there was no final appealable order.

The general rule is that "[a] notice of appeal from a nonappealable order does not render void for lack of jurisdiction acts of the trial court taken in the interval between the filing of the notice and the dismissal of the appeal by the appellate court." *Murray v. Stine*, 291 Neb. 125, 131, 864 N.W.2d 386, 391 (2015) (citing *In re Guardianship of Sophia M.*, 271 Neb. 133, 710 N.W.2d 312 (2006)). Both Tara and Byron filed a notice of appeal from the denial of their motions for supervised visitation on September 21, 2018. This court dismissed those appeals for lack of jurisdiction on June 25, 2019. Prior to the dismissal, but after the notices of appeal were filed, the juvenile court held trial on the motions for termination of parental rights on October 29, December 3, and December 6, 2018. The final order was entered on January 24, 2019. Because there was no final appealable order before this court, the juvenile court never lost jurisdiction of the case and was permitted to proceed to trial.

## 2. TERMINATION OF TARA'S PARENTAL RIGHTS

### (a) Statutory Grounds for Termination

Under § 43-292, a court
may terminate all parental rights between the parents or the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist[.]

The statute then goes on to list 11 statutory bases for termination. In this case, the State alleged that termination of Tara's parental rights was appropriate under § 43-292(2), (6), and (7). Any of the 11 separate conditions under § 43-292 may serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). Under § 43-292(7), grounds for termination exist if "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months[.]"

In her brief, Tara concedes that the children were out of her home for 15 or more months of the most recent 22 months prior to the filing of the termination petition. Nevertheless, we note that the record reflects the children first entered foster care on November 4, 2016, and did not return to the home of Tara at any point prior to the filing of the termination petition on May 15,

2018, nor prior to trial commencing on October 29, 2018, a span of nearly 2 consecutive years. Because Tara does not contest the State established § 43-292(7) by clear and convincing evidence and we find that the record in fact reflects the children remained in foster care for 15 or more of the most recent 22 months preceding the filing of the termination petition, the State met its burden and a statutory basis for termination exists.

(b) Best Interests

Once a statutory basis for termination has been proven, the next inquiry is whether termination is in the child's best interests. *In re Interest of Audrey T.*, 26 Neb. App. 822, 924 N.W.2d 72 (2019). Such a showing must be made by clear and convincing evidence. *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Zachary D. & Alexander D.*, 289 Neb. 763, 857 N.W.2d 323 (2015).

A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Aly T. & Kazlynn T.*, 26 Neb. App. 612, 921 N.W.2d 856 (2018). There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or probably will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

Tara attempts to argue that because the State "used only caseworkers and managers instead of those directly involved with the case to determine what was in the best interests for [the children]," brief for appellant at 22, the instant case is similar to the facts of *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005), where the Nebraska Supreme Court found the State had not adduced sufficient evidence to find termination of parental rights in the minor child's best interests. However, this is not so. Over 3 days of trial the State called not only PromiseShip family permanency specialists and supervisors, but also the children's therapist, foster parents, and CEDARS workers who were directly involved in the supervision of Tara's visitation and care of the children.

While there were only two workers who directly testified to their professional opinion regarding whether termination was in the children's best interests, we do not require direct opinion testimony to make a best interests determination. Instead, in our de novo review, we look to the record as a whole to determine whether there is clear and convincing evidence that termination is in the children's best interests. In the instant case, we find that the State produced sufficient evidence that termination of Tara's parental rights was in the minor children's best interests.

The record reflects that Tara and her children have a long history with DHHS. While a number of intakes received by the CPS hotline over the years were resolved without further action, in November 2016, the children were ultimately removed from the home of Tara and Byron due

- 14 -

to unkempt living conditions and educational neglect. Since the children entered State custody--nearly 2 years before the trial in this matter commenced--very little progress was made to satisfy that reunification with Tara was in the best interests of the children.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Brooklyn T. & Charlotte T.*, 26 Neb. App. 669, 922 N.W.2d 240 (2018). In this case, Tara was ordered to complete a number of requirements as part of her court-ordered rehabilitation and permanency plan. Nevertheless, the children remained in State custody while Tara failed to complete these permanency objectives. Particularly concerning is Tara's failure to address the very concerns that brought the children into State custody to begin with, particularly concerns of domestic violence within the home, unsuitable housing, and educational neglect.

Lohman, the family permanency specialist, testified that throughout her time on the case, Tara repeatedly recanted on her previous allegations of domestic violence against Byron. Furthermore, throughout the duration of the case, none of the permanency specialists or visitation supervisors were able to discern the relationship between Tara and Byron. Despite the fact that Tara had previously requested a protection order because she felt unsafe around Byron and some of the children had reported incidences of domestic violence in the home, Tara and Byron nevertheless moved back in together in March 2018. Furthermore, this was the first stable housing that either Tara or Byron had since the children were taken into State custody well over a year earlier. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015).

There was also testimony that Tara's visitation schedule was reduced and altered on a number of occasions due to her inconsistent attendance, failure to confirm scheduled visits, and generalized chaos on visits. Ultimately, visitation was suspended due to the chaotic nature of visits. Prior to the suspension, Tara needed assistance on visits, would often talk negatively about visitation supervisors and foster parents, and would make promises to the children she could not keep regarding timeframes they would return home.

The evidence also shows that since remaining in foster care, the children have experienced reduced symptoms of social anxiety, are more comfortable within the home, have vastly improved in their education, are excited about learning, and are happier overall. As a result, because of the concerning nature of the issues in this case, Tara's seeming unwillingness to accept responsibility and make positive strides toward rehabilitation and reunification, and the lengthy duration of this case, we find that it was in the best interests of the children that Tara's parental rights be terminated.

### 3. TERMINATION OF BYRON'S PARENTAL RIGHTS

#### (a) Statutory Grounds for Termination

In its second motion for termination of parental rights, the State alleges that a statutory basis exists to terminate the parental rights of Byron under § 43-292(2), (6), and (7). In his brief, Byron attempts to intermingle the statutory basis analysis with the separate best interests analysis. In doing so, Byron relies on the Supreme Court's decision in *In re Interest of Angelica L. & Daniel*

*L.*, 277 Neb. 984, 1006, 767 N.W.2d 74, 92 (2009), where the Supreme Court recognized the 15-month time period under § 43-292(7)

> merely provides a guideline for what would be a reasonable time for parents to rehabilitate themselves to a minimum level of fitness. Regardless of the length of time a child is placed outside the home, it is always the State's burden to prove by clear and convincing evidence that the parent is unfit and that the child's best interests are served by his or her continued removal from parental custody.

We agree that establishing its burden under § 43-292(7) does not relieve the State of establishing parental unfitness and that termination is in the best interests of the children. Nevertheless, this is a separate analysis.

Here, we have already determined that the record reflects the children were first placed in foster care in November 2016, where they remained past the filing of the termination petition on May 15, 2018, and through trial commencing in October. Therefore, the State has proved, by clear and convincing evidence, that the children remained in an out-of-home placement for 15 or more months of the most recent 22 months and the condition of § 43-292(7) was met.

(b) Best Interests

Many of the same facts underlying our best interests in regard to Tara equally apply to Byron. First, Byron continuously delayed a number of court-ordered requirements under his rehabilitation and permanency plan. Longwell, who was the family permanency supervisor between May 2017 and November 2018, testified that Byron was unemployed for a significant period of time when she first was assigned to the case. Furthermore, like Tara, Byron did not obtain stable housing until March 2018, well after it was initially ordered by the court in March 2017.

However, our primary concern regarding Byron's parental fitness and the children's best interests as it relates to the termination of Byron's parental rights, is the repeated allegations of domestic violence within the home. While it is true Byron has never been convicted of any sort of domestic violence, we find it particularly concerning how many times Byron is found at the epicenter of such reports. The CPS hotline has received a number of concerning intakes alleging violent acts by Byron dating back to 2004. At one point, Tara had even sought a protection order against Byron, encompassing the children. While the protection order ultimately was dismissed, this does not alleviate our concern that repeated instances of domestic violence occurred within the home. Duhacheck-Chase, the therapist for both the children and Tara, testified that Tara indicated to her that "at times [Byron] could be controlling and possessive, aggressive towards her and the kids." In fact, Lohman testified that "John had reported on different occasions that he didn't feel safe with his parents. At one face-to-face in particular -- I believe it was January of 2017 -- he reported being pushed through a window by [Byron]."

Also concerning is the fact that throughout the duration of this case Byron has refused to accept any sort of responsibility for his actions and take efforts to rehabilitate his past transgressions. Hofmann, the family permanency specialist between September 2017 and trial, testified that Byron repeatedly denied any issues of domestic violence and called the entire thing a "misunderstanding." She testified that "[i]n the month of November 2017 when [Byron] did start

- 16 -

the batterer's intervention program he told me that he was upset that he had to admit he was a batterer because he doesn't believe he's a batterer. He's just a jealous boyfriend." We find this characterization of something as serious as domestic violence, and the fact Byron refuses to accept any sort of responsibility, particularly concerning.

Overall, based on our de novo review of the record, the comparable facts surrounding best interests discussed in regard to Tara above, and the ongoing concerns of domestic abuse in the home, we find that termination of Byron's parental rights is in the best interests of the children.

## VI. CONCLUSION

The juvenile court did not err in finding that it had jurisdiction to proceed to trial on the motions to terminate parental rights. Further, the court did not err in finding a statutory basis to terminate both Tara and Byron's parental rights under § 43-292(7), that each parent was unfit, and that termination was in the best interests of the children.

AFFIRMED.